COX v. ROBISON, Commissioner of General Land Office.

(Supreme Court of Texas. Nov. 27, 1912.)

1. MINES AND MINERALS (§ 4*)—GRANTS — RESERVATION—CONSTITUTIONAL AND STATUTORY PROVISIONS—"RELEASE"—"OWNER."

Const. art. 14, § 7, providing that the state thereby releases to the owner or owners of the soil all mines and minerals thereon, was curative in its nature and retrospective in its effect, and intended as an extinguishment of the rights of the state in only those mines and minerals in soil owned at the time of its adoption, and was not intended to prevent the state from reserving mines and minerals in lands of the public domain subsequently granted by it, in view of the facts that this provision was originally adopted by the convention which framed the Constitution of 1866 at a time when the state could not afford to be generous in its disposal of the ungranted public domain; that it was adopted, not as a general provision of the Constitution, but as an ordinance substituted for one having special reference to the title to a salt lake, then in dispute; and that its language has remained unchanged in subsequent Constitutions, especially as the term "release" commonly means to surrender a right or discharge a liability which presupposes the existence of some person against whom the right may be exercised or the liability enforced, and the word "owner" ordinarily means one who already has a legal or rightful title, and not one who must acquire such title in the future, in order to come within the term; and hence Rev. St. 1895, art. 3498n, reserving minerals on lands thereafter granted by the state, is valid.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 4; Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 6, pp. 5134–5151; vol. 8, p. 7744; vol. 7, pp. 6059–6061; vol. 8, p. 7783.]

2. CONSTITUTIONAL LAW (§ 13*)—CONSTRUCTION OF CONSTITUTIONS—INTENT.

The fundamental rule in construing Constitutions is to give effect to the intent of the people who adopted it.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 9, 10; Dec. Dig. § 13.*]

3. CONSTITUTIONAL LAW (§ 12*)—CONSTRUCTION OF CONSTITUTIONS—MEANING OF LANGUAGE.

The meaning of a Constitution is fixed when it is adopted, and is not different at any subsequent time.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 9; Dec. Dig. § 12.*]

4. CONSTITUTIONAL LAW (§ 16*)—CONSTRUCTION OF CONSTITUTIONS — EXTRINSIC AIDS TO CONSTRUCTION.

Where the terms of a Constitution are plain and definite, that which the words declare is the meaning of the instrument; but where the terms are ambiguous, and are not rendered plain by other parts of the instrument, the court may consider the prior state of the law, the subject-matter, and purpose sought to be accomplished, and may consult the proceedings of the convention and the attending circumstances, to discover their true meaning.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 12, 16; Dec. Dig. § 16.*]

5. CONSTITUTIONAL LAW (§ 16*)—GRANTS — RESERVATION—CONSTITUTIONAL PROVISIONS.

Const. art. 14, § 7, providing that the state thereby releases to the owner of the soil all mines and minerals thereon, is ambiguous as to whether it is prospective or retrospective in its operation, and justifies resort to extrinsic circumstances to ascertain its meaning.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 12, 16; Dec. Dig. § 16.*]

6. CONSTITUTIONAL LAW (§ 18*)—CONSTRUCTION OF CONSTITUTIONS — READOPTION OF PROVISIONS.

The readoption in a Constitution of a provision of the Constitution thereby superseded is presumed to be with a purpose not to change the law; and the use of the same language in the new Constitution is presumed to be with the same intent.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 13, 17; Dec. Dig. § 18.*]

7. CONSTITUTIONAL LAW (§ 3*)—ADOPTION OF CONSTITUTIONS — SUBMISSION TO POPULAR VOTE.

The ordinances adopted by the convention which framed the Constitution of 1866 were valid without a vote of the people; the President's proclamation calling such convention not requiring a submission of its work to the people.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 1; Dec. Dig. § 3.*]

8. CONSTITUTIONAL LAW (§ 14*)—CONSTRUCTION OF CONSTITUTIONS—MEANING OF LANGUAGE.

Words used in a Constitution must be given their popular meaning, unless it is clear that they were used in their technical sense.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 11; Dec. Dig. § 14.*]

9. CONSTITUTIONAL LAW (§ 14*) — CONSTRUCTION OF CONSTITUTIONS—MEANING OF LANGUAGE.

In construing Constitutions it will be presumed that the language used was carefully selected.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 11; Dec. Dig. § 14.*]

10. CONSTITUTIONAL LAW (§ 23*)—STATUTES (§ 263*) — PROSPECTIVE OR RETROSPECTIVE OPERATION.

As a general rule, Constitutions and statutes operate prospectively; but they may operate retrospectively when it is apparent that such was the intention, provided no impairment of vested rights results.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 20; Dec. Dig. § 23;* Statutes, Cent. Dig. §§ 344, 349; Dec. Dig. § 263.*]

11. CONSTITUTIONAL LAW (§ 20*)—CONSTRUCTION—SUBSEQUENT LEGISLATIVE CONSTRUCTION.

While not binding on the courts, an unchallenged construction of a constitutional provision by the legislative department for more than a quarter of a century should be given effect, unless manifestly wrong.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 14, 15; Dec. Dig. § 20.*]

Original petition by A. A. Cox for a writ of mandamus against J. T. Robison, Commissioner of the general land office. Writ denied.

Gillett & Hudspeth, of El Paso, for relator. Jewell P. Lightfoot, Atty. Gen., and Jno. L. Terrell, Asst. Atty. Gen., for respondent.

PHILLIPS, J. This is an original suit for mandamus to compel the issuance to the relator by the Commissioner of the General

Land Office of an unconditional patent to 80 acres out of a section of land belonging to the public free school fund, situated in Culberson county and being in the "Pacific Reservation," referred to in article 3498a, Revised Statutes of 1895.

The relator's application to purchase, made under the provisions of title 87, c. 12a, Revised Statutes 1895, and amendatory acts, and not under title 71, relating to the sale of mining claims, or the public lands therein referred to as mining land, was filed in the General Land Office on May 25, 1907, and the land was awarded him on June 15, 1907. Prior to the time of the application, the land had been classified by the Land Commissioner, under the authority of law, as grazing land containing mineral deposits. It was appraised and valued as grazing land at $1.50 per acre. The application was made and the land awarded upon the Commissioner's classification and at such valuation. In connection with his application to purchase, the relator filed in the Land Office his affidavit that to the best of his knowledge and belief there were no minerals embraced in title 71 on the land, and therein waiving all rights thereto in the following terms: "That said land has heretofore been classed as mineral land, and believing there to be no mineral thereon, and hereby waiving all right to the minerals on said section to the state of Texas, should there be any mineral deposits of any character hereafter found in or on said land, and in the event of a sale to me of the foregoing land it is expressly agreed and understood that I acquire no right, title or interest in or to any minerals that are now or may hereafter be found to exist in or on said land."

The relator alleges that this affidavit and waiver were involuntarily executed by him, having been required by the Commissioner under article 3498n, which reads as follows: "Whenever any application shall be made to buy or obtain title to any of the lands embraced in article 3498a, except where the application is made under this title, the applicant shall make oath that there is not, to the best of his knowledge and belief, any of the minerals embraced in this title thereon, and when the Commissioner has any doubt in relation to the matter he shall forbear action until he is satisfied. *Any such sale or disposition of said lands shall be understood to be, with the reservation of the minerals thereon, to be subject to* location as herein provided."

On February 7, 1912, the relator duly tendered to the Commissioner the balance of the purchase money, with all accrued interest and the proper patent fee, and demanded the issuance in his favor of an unconditional patent to the land; that is, a patent without any reservation to the state of the minerals. The Commissioner having refused to issue such a patent, this action has resulted.

[1] The question presented by the case is the constitutionality of article 3498n, above quoted. It is contended by the relator that upon the adoption of section 7, art. 14, of the Constitution, the state lost its power to enact laws providing for the reservation of minerals in the conveyance of its public schools, university, and asylum lands, and the other public lands referred to in article 3498a; that article 3498n, declaring that any sale of such lands, other than as mining claims, as provided in the other articles of the title, should be understood to be with the reservation of the minerals thereon, is accordingly unconstitutional; and that therefore relator is entitled to an unconditional patent.

Section 7 of article 14 of the Constitution reads as follows: "The state of Texas hereby releases to the owner or owners of the soil all mines and minerals that may be on the same, subject to taxation as other property."

If this provision was intended by the framers of the Constitution and the people who adopted it as a grant by the state to both the then and all future owners of the soil of all mines and minerals that might be in it, the state must be held to have been without authority to in any wise further control their disposition; and, if so construed, this section of the Constitution amounts to a limitation upon the power of the Legislature to enact laws of the character of the statute under review. If, however, it was curative in its nature and retrospective in its effect, and intended as an extinguishment of the rights of the state in only those mines and minerals in soil owned at the time of its adoption, the title of the state to all other mines and minerals in lands of the public domain remained unimpaired and unaffected; and its authority to provide by law that their reservation should be made in future conveyances of such lands must be recognized.

When it is recalled that the development of the mineral resources of Texas is still in a state of infancy; that even their meager disclosure to this time furnishes evidence that in them reposes a wealth whose rich extent in the day of its full ascertainment may give new character to the state's resources and materially transform its industrial life, and that there yet remains undisposed of in the hands of the state an immense public domain dedicated to the free education of its youth, whose mineral value is commonly estimated at a large amount and will endure for their benefit, should this legislation be upheld, but of which they will be deprived, to the benefit of purchasers and the encouragement of settlement, if it be held invalid; and that we are dealing, therefore, with a question, not only of present concern, but vital in its bearing upon the future of the state, whether viewed in relation to its educational interests or from the standpoint

of those who shall hereafter come to inhabit these lands and compose its citizenship—it will be appreciated that the decision as to where, under the Constitution, the title to these minerals rests is of such consequence as to challenge the most serious consideration and constrain the court to a solicitous care for the accuracy of its conclusions.

[2-4] The fundamental rule for the government of courts in the interpretation or construction of a Constitution is to give effect to the intent of the people who adopted it. The meaning of a Constitution is fixed when it is adopted; and it is not different at any subsequent time when a court has occasion to pass upon it. People v. Blodgett, 13 Mich. 127. Where its terms are plain and definite, that which the words declare is the meaning of the instrument. In such cases there is no room for construction; the words of the instrument lie before the court already molded to their use, and its province extends no further than the enforcement of the language as written. If the terms of a particular provision are ambiguous, and other parts of the instrument do not make them plain, under another well-established rule the court is at liberty to consider the prior state of the law, the subject-matter, and the purpose sought to be accomplished, as well as to consult the proceedings of the convention and the attending circumstances, for whatever extrinsic aid they may render the court in its effort to discover the true meaning of the provision.

[5] It can with some reason be contended that the meaning of the phrase in this provision, *"hereby releases to the owner or owners of the soil,"* is not plain; and upon this account we are authorized to make use of whatever proper information will help to make it certain.

We can better understand this provision if we understand its history. A full investigation has therefore been made into its sources, developing some features that possess interest, as well as influence, in the solution of the question. The provision is first found in the Constitution of 1866. It was repeated with but slight variation of language in the Constitution of 1869; and, as incorporated in the present Constitution, its language is substantially that of the original provision of the Constitution of 1866. As found in the Constitutions of 1866 and 1869, the provision was as follows:

Constitution 1866, § 39, art. 7: "That the state of Texas hereby releases to the owner of the soil all mines and mineral substance, that may be on the same, subject to such uniform rate of taxation, as the Legislature may impose. All islands along the Gulf coast of the state, not now patented, or appropriated by locations under valid land certificates, are reserved from location or appropriated (appropriation) in any other manner by private individuals than as the Legislature may direct."

Constitution 1869, § 9, art. 10: "The state of Texas hereby releases to the owner or owners of the soil all mines and mineral substances that may be on the same, subject to such uniform rate of taxation as the Legislature may impose."

[6] The readoption in a subsequent Constitution of a provision found in the Constitution that it supersedes is presumed to have been with a purpose not to change the law; and the use of the same language is presumed to have been with the same intent. Cooley, Const. Lim. 75; Muench v. Oppenheimer, 86 Tex. 568, 26 S. W. 496; State v. Board of Assessors, 35 La. Ann. 651.

[7] The convention that framed the Constitution of 1866 was called upon the proclamation of President Johnson, which did not require any part of its work to be submitted to the people for their ratification; and the ordinances that it adopted were therefore valid without a vote of the people. Quinlan v. H. & T. C. Ry. Co., 89 Tex. 377, 34 S. W. 738. As the present provision had its origin in the Constitution of 1866, and is in substantially the language of the provision of that instrument, we have considered that no surer method of determining its meaning could be employed than to ascertain with what intent the framers of the Constitution of 1866 adopted the original provision. To this end the prior state of the law and the circumstances which appear, with some certainty, to have influenced their action may well be considered here.

By the Mexican law all mines, and by the common law all royal mines—that is, those of gold and silver—belonged to the sovereign; and their metals or minerals did not pass by the ordinary grant of the land, without express words of designation. Upon the establishment of an independent government, we find that among the early acts of the Texas Congress was that of June 3, 1837, under which, in its grants of land, there was secured to the republic, by express reservation, the same right in all minerals that by the common law was reserved to the king in respect to royal mines; the language of the act upon this subject being as follows: "Provided that no lands granted by this government shall be located on salt springs, gold or silver mines, copper or lead, or other minerals, or on any island of the republic." Paschal's Dig. (5th Ed.) art. 4402.

This act was before the court in Cowan v. Hardeman, 26 Tex. 217, decided November 19, 1862, and was so construed by Judge Moore in the following language: "The object and purpose of the Legislature was simply to reserve to the republic the islands and salt springs, gold and silver mines, copper and lead, and other minerals, as corporeal hereditaments out of the public domain; and thus, while the mineral resources of the country that were then known to exist, or that might afterwards be developed, were

thereby secured to the government, no embarrassment was placed in the way of the citizen in acquiring the fee in the quantum of land to which his certificate or scrip entitled him." In the act of January 20, 1840, adopting the common law and repealing certain Mexican laws, in the repealing section there were expressly excepted all laws relating to "the reservation of islands and lands, and also of salt lakes, licks and salt springs, mines and minerals of every description." Paschal's Dig. art. 804. There was thus manifested in the very beginning of the state's history, at the very outset of its career, a ·fixed purpose and established policy to reserve its minerals from the appropriation of the land, evincing, as Judge Wheeler said in Cowan v. Hardeman, "the solicitude of the Legislature to guard the interests of the state" in them.

From an early time there has existed in Hidalgo county a famous salt lake, called El Sal del Rey. It was of large extent and regarded as of great value. Public historic accounts are to the effect that its salt was comparatively pure as dug from its bed and apparently inexhaustible. For many years it was the source of supply for people on both sides of the lower Rio Grande, and during the Civil War it furnished salt for a large portion of Southern Texas. In later years it was the subject of a suit at the hands of the state; the case having been appealed to this court. State v. Parker, 61 Tex. 265. A patent to the land on which it was situated was issued by the state in 1847. This patent was confirmed by an act of the Third Legislature in 1850, in which the state relinquished all its rights. Special Laws Third Leg. p. 96. However, by joint resolution of the Ninth Legislature, approved January 10, 1862, the state asserted its title to the lake and required the Governor to take possession of it, to detail troops to maintain such possession, and requiring the agent of the state, placed in possession to sell its salt at the customary rates. We quote the preamble of the resolution: "Whereas, a valuable salt lake exists in Hidalgo county, known as 'El Sal del Rey,' which was reserved as the property of the crown of Spain, the title to which became vested in the state of Texas, which title, inasmuch as said lake could not be lawfully patented, could not be lost by prescription; and whereas, it is desirable to secure the revenues of the said lake for the state, and at the same time supply the people with salt at a reasonable rate: Therefore." Laws Ninth Leg. p. 61.

Reference is made to the lake El Sal del Rey and this much of its history because of its relation to this constitutional provision and the part it is shown to have played in its original adoption. As disclosed by the journal of the convention, at page 214, the identical provision of the Constitution of 1866 was reported on March 17th by the committee on general provisions of the Constitution as a substitute for an ordinance theretofore referred to the committee, "relative to the salt lake El Sal del Rey." These proceedings are thus recited in the journal: "Mr. Hancock, chairman of the committee on general provisions of the Constitution, by leave, made the following report: 'Committee Room, March 17th, 1866. Hon. W. M. Taylor, President pro tem. of the Convention: The committee on general provisions of the Constitution, to whom was referred an ordinance relative to the salt lake known as "El Sal del Rey" have had the same under consideration, and direct me to report the following substitute for the same, and recommend its passage: Section, to be added to general provisions of the Constitution: That the state of Texas hereby releases to the owner of the soil all mines and mineral substances that may be on the same, subject to such uniform rate of taxation as the Legislature may impose. All islands along the Gulf coast of the state, not now patented or appropriated by locations under valid land certificates, are reserved from location or appropriation in any other manner, by private individuals, than as the Legislature may hereafter direct. Read first time, and passed to the orders of the day.' "

Immediately preceding this reference there is set out an ordinance on the subject of mines, minerals, salines, etc., referred to as introduced, and read and referred to a committee, providing "that all mines, etc., heretofore discovered or used, or which may hereafter be discovered, shall be and the same are hereby declared to be the property of the rightful owner of the land on which the same may ₒbe situated;" but it is not clear that it is the ordinance as a substitute for which the provision found in the Constitution of 1866 was reported by the committee on March 17th, as above stated. It is valuable, however, as revealing a deliberate choice of language on the part of the convention in its use of the terms found in the provision that it adopted.

Investigation further develops that, while the provision was reported as a section to be added to the general provisions of the Constitution, was afterwards printed as a general provision, and is so found in the printed copies of that instrument now in existence, it was really adopted by the convention only as an ordinance, and not as a general provision of the Constitution. At page 360 the following appears: "On motion, an *ordinance* touching the subject of mines, minerals and salines, taken up, read a third time and passed." And at page 361 the committee on "Enrolled and Engrossed Ordinances" finds correctly enrolled and properly signed "an *ordinance* on the subject of mines, minerals, salines and oil springs." These references must have been to the provision afterwards printed as section 39 of article 7 of the Constitution, because, so far as is disclosed, it

was the only final enactment of the convention on the subject. Furthermore, in the first edition of Paschal's Digest it was printed only as an ordinance passed by the convention, and not as an adopted general provision of the Constitution, being there set out as Ordinance 15, p. 952. In note 1180, p. 954, vol. 1, of the fifth edition of Paschal's Digest, it is recited that in the first edition of that work the Constitution and Ordinances of the convention of 1866 were copied from a pamphlet issued by the convention, and in such pamphlet the fifteenth ordinance related to mines and minerals; but that in the acts of the Eleventh Legislature the secretary of state published what was enacted by the convention on that subject as the thirty-ninth section of the 7th article of the Constitution.

It would seem to be, therefore, certain that this section, which we now find in the printed copies of the 1866 Constitution as a general provision, was never so adopted by the framers of that instrument. But other evidence exists which confirms this. It is printed as the third section, under the head "Mode of Calling a Convention and Amending the Constitution of this State." The first two sections preceding it properly relate to that subject; but it in no wise does so. Furthermore, it begins with the introductory conjunction "that"—an introductory word common to ordinances and statutes, but unusual in Constitutions, and not found in such position in any other general provision of that Constitution.

That the section was adopted by the convention of 1866 as an ordinance, and not as a general provision of the Constitution, does not subtract from its force as a binding enactment; but it has an important bearing upon the determination of its purpose and the scope and effect its framers intended it to have. Constitutions declare the organic law of the state, and generally comprise only "the rules and maxims in accordance with which the powers of sovereignty are habitually exercised." They deal with large subjects, and are expressed in broad terms. As a rule, their provisions are not availed of for validating or curative purposes, though they may be; and in some instances have been, so employed. As against the view that this provision was adopted with a curative object, and was intended to be limited in its effect, releasing the rights of the state in only the mines and minerals that were in soil owned at the time, it might well be argued, if such was its purpose, why was a constitutional provision employed? And it might well be further asked in such connection: Did not the use of a constitutional provision, with its recognized broader purpose and large application, manifest a design to thereby announce a new public policy on the part of the state, and to declare a relinquishment of its claims to all minerals in all lands, whether then owned or thereafter purchased? There would be some force in such argument if a constitutional provision had been in fact employed. But when we find that the terms of this enactment were not embodied in a constitutional provision, and did not have the broad and general character of a constitutional declaration, we are driven from the view that its purpose was the proclamation of a public policy, or that its intention was that of a general grant. And when we further find that, instead of the adoption of its terms as a general constitutional provision, whereby they would possess the ampler attributes common to the language of a constitution, the framers of that instrument, upon deliberation, as it must be assumed, employed an ordinance as the medium of their expression, and, as the proceedings of the convention establish, related the provision to a particular body of mineral the title to which was then in dispute, we are bound to conclude, in the light of the language used, that it was their intention that it should have only a limited effect. True the question for decision is only whether the statute here involved contravenes the present Constitution; and as there embodied in section 7 of Article 14 the provision is before us in the full character of a general constitutional declaration. Its terms must be considered as of such dignity, and be given all the effect that their nature imposes. But its effect is controlled by the intent that lay behind it on the part of the people who wrote it into the present Constitution. Their act was but a readoption of the original provision. It is not essential that identical conditions and the same reasons should have influenced both its original adoption and subsequent readoption, although it may be assumed that in both instances the conditions were like and the reasons similar. However that may be, when we come to consider the intended scope and operation of the terms employed, an inexorable logic compels us to conclude that their deliberate use of the same language must have been with the intent that the provision should have in their time the same operation and effect that it was designed to have in the day of its original enactment. Because of its force as a rule of reason, this is a recognized rule of law. And under its manifest application we may be assured that, if we can truly determine the intention of the framers of the 1866 Constitution in their enactment of the original provision, we will be furnished with a plain interpretation of the present section of the Constitution.

That the original provision was reported to the 1866 convention as a substitute for "an ordinance relative to the salt lake known as El Sal del Rey" cannot be regarded as otherwise than strongly significant of its object and scope. It establishes a relationship influential then in the adoption of the provision and interpretative now of its language. While the state had, in 1847, issued its pat-

ent to this lake, and in 1850 had, by express act of the Legislature, confirmed the patent and relinquished all its rights, later, in 1862, it is found to have asserted its title by formal resolution of the Legislature, and directed a seizure of the mineral by the Governor. In the same year Cowan v. Hardeman had been decided, construing the act of June 3, 1837, so as to vest in the state the title to all minerals to which its rights had not been expressly released. When the convention met, therefore, the title to this particular body of mineral, recognized as of great value and importance by the convention's cognizance of it, was in dispute at the hands of the state, notwithstanding its previous relinquishment; and under the ruling of Cowan v. Hardeman its title to all other minerals in lands theretofore granted and then owned, not theretofore expressly released, was subject to be asserted and enforced. It is plainly to be inferred that it was these conditions and circumstances that brought the subject to the attention of the members of that body. The proceedings of the convention establish with reasonable certainty that the source of the ordinance adopted by the convention lay in a purpose to validate the title to the salt lake El Sal del Rey. The ordinance, for which the adopted ordinance was reported as a substitute, is shown to have related particularly to that lake. Its provisions are not disclosed; but, inasmuch as the state, in the face of its patent and express relinquishment, had theretofore disputed the title, and the exigencies of war, that doubtless prompted it to such action, had now passed, it is fair to assume that its purpose was to provide for the validation of that particular title. While this is not definitely shown, it is, we think, a reasonable inference, in that the effect of the substitute ordinance was to validate the title, together with all other titles to minerals in soil then owned; and it is difficult to perceive why the subject of this lake was before the convention, unless it was in relation to the uncertain status of its title. As the substitute ordinance—that is, the ordinance that was adopted—necessarily included that title in its operation, the convention must have recognized that it was entitled to be quieted. And as the title of the state to all other minerals, not expressly released, was subject to be enforced under the holding of Cowan v. Hardeman, the convention doubtless considered that an equal justice required that the benefits of its action be not confined merely to "the owner" of the soil upon which the lake El Sal del Rey was situated, and applied only to that particular body of mineral, but that the same relief should be extended to every "owner of the soil" and applied to all minerals in soil then "owned." To accomplish this an enactment, general in its terms, was necessary; and we are warranted in believing from the proceedings that it was to effect such purpose that the substitute ordinance was reported by the committee and adopted by the convention.

There is nothing in the proceedings that suggests that the convention intended this ordinance to have a prospective effect, while every evidence furnished by the journal is consistent with a purpose to give it a curative character and use. We find that the convention made general use of ordinances as relief or validating acts. By section 1 of Ordinance 11 it validated all laws enacted by the Legislature since February 1, 1861, not in conflict with the Constitution of the United States and the Constitution of the state in force at the time, etc., and all acts of courts and officers done in compliance with such laws, etc. By section 2 of the same ordinance it validated the acts of all officers appointed by the provisional Governor, A. J. Hamilton. By section 5 of the same ordinance, it relieved against civil suits or criminal prosecutions on account of any seizure, etc., of property since February 2, 1861, in pursuance of the civil or military authority given by the Confederate States government, etc. By section 6 it relieved all civil actions from the operation of the statutes of limitation during the time of the Civil War. By section 9 it relieved all counties of the state from suits to recover any debt contracted in support of the late war. By section 10 it relieved all property in the state from the effect of all tax sales made within the period of the war. And by another ordinance it validated all warrants issued by Governor Houston prior to March, 1861, for the payment of troops called into the service of the state.

Bearing in mind that the ordinances enacted by the convention were valid upon their adoption, without ratification by the people, and that the convention devoted this power that it thus possessed to the relief of the people and property of the state in many other respects, it is not difficult to credit it with a purpose to quiet the owners of land, which the state had theretofore granted, in their title to whatever minerals might be in the soil by "releasing" to such owners the previous right of the state, recently declared to exist by the decision rendered in Cowan v. Hardeman. But considering the membership of that convention and the conditions under which they performed their labors, it is hard to believe that they intended, through the office merely of an ordinance, by an independent act of their own, without the sanction of the people, to make a grant so broad and general, in respect to lands yet ungranted, as to deprive the state of all power to thereafter conserve for a sacred use a resource held in such value as to have been the subject of a constant and jealous care. It must be remembered that it was not a time for a measure so free in its disposal of the ungranted public domain,

and so generous in its provision for mere prospective purchasers. Whatever the appeal of equitable considerations in respect to lands with the title to which the state had parted, all things urged a prudent husbandry of its resources rather than a liberal disposition of them. The state had just passed through a ruthless and ruinous war. Its devastation lay over the land, and the gloom of its tragic close pervaded the people. Their minds turned naturally to rehabilitation and repair, where they faced the stern necessity of a frugal use of whatever had survived waste and destruction. The work of the convention was given largely to such measures, and in that provident spirit, we may be assured, that the hard conditions of the time demanded.

[8, 9] But the very terms themselves, employed in the ordinance of the 1866 convention and in the present Constitution, forbid the view, as it seems to us, that they were intended to have a prospective effect. While the phrase "hereby releases," and the term "owner," both may be said to have a technical meaning, we are required to give them their popular sense, unless it is clear that they were used in their technical sense. While a deed of release may be treated as a grant, if necessary to carry out the intention of the parties, or may operate as a confirmation of title (Richardson v. Levi, 67 Tex. 367, 3 S. W. 444; Smith v. Cantrell [Civ. App.] 50 S. W. 1085), in the law of real property it is generally defined as "a discharge or conveyance of a man's right in land or tenements to another that has some former estate in possession." Anderson's Dict. of Law, 871. It is a secondary or derivative sort of conveyance "which presupposes some other conveyance precedent." 1 Cooley's Blackstone, 518. At common law it could operate only upon an existing or vested right, and not upon a contingent one. Crawford v. Lockwood, 9 How. Prac. (N. Y.) 547. While we have no purpose to give the term a technical meaning, and prefer to construe it in its ordinary sense, "as the people who adopted it would construe it," as Judge Gaines said in Brady v. Brooks, 99 Tex. 366, 89 S. W. 1052, it is a rule of universal observance in the construction of Constitutions that it will be presumed that the language used was carefully selected. Mellinger v. City of Houston, 68 Tex. 44, 3 S. W. 249; and we are at liberty to extend that presumption to the use of the language of this provision. While the term "release" is sometimes used in conveyancing to transfer a title, its general meaning is to surrender a right or discharge a liability. Amherst College v. Ritch, 151 N. Y. 338, 45 N. E. 876, 37 L. R. A. 305. But the surrender of a right or the discharge of a liability presupposes, as commonly understood, the existence of some person against whom the right may be exercised or the liability enforced.

As commonly used between parties, and not as a technical term of conveyance, in its usual acceptation the term implies that there is already a status between them whereby one has a right or demand against the other which is capable of exercise or enforcement. Ordinarily it does not signify the relinquishment of a right relating to or comprised by a future status. It is true that the term may be so employed; but such is not its common use or popular meaning.

Had the authors of this provision intended it to have a prospective operation and effect, they could, and it is fair to assume that they would, have used terms whose undoubted common use and meaning would have made that intention plain, instead of a term whose usual significance is not prospective, and to which we must attach a use it does not ordinarily have, and impart a meaning it does not commonly bear, in order to give the provision a prospective interpretation.

That the term "owner" was used in connection with the phrase "hereby releases" gives the entire phrase further significance. In its ordinary meaning an "owner" is "one who owns; a rightful proprietor; one who has the legal or rightful title, whether he is the possessor or not." Webster's Dict.; Turner v. Cross & Eddy, 83 Tex. 225, 18 S. W. 578, 15 L. R. A. 262. While its use in an instrument may relate to "future owners," as well as "owners," it ordinarily means one who already has a legal or rightful title, and not one who must acquire such title in the future in order to come within the term. Here, again, we must give another term of the provision an unusual, though possible, meaning if we construe it as prospective. Giving the term "owner" its ordinary significance, it is the more plain that the phrase "hereby releases" was used to denote the relinquishment of a right that was then capable of enforcement, presupposing the existence of a status or condition that called for its exercise, and an existing person against whom it could be exercised. The existing status was the possession by grantees or their assigns of minerals which belonged to the state. The right capable of enforcement was the foreclosure of the state's title to the mineral. The state being out of possession of what it owned was the condition that called for the enforcement of the right. The existing person against whom the right was subject to be exercised was the owner of the soil. As the design of the provision plainly was to effect a relinquishment of the rights of the state, if we give it a present or retroactive operation, we have, therefore, in conjunction those elements of condition, rights and parties that would call for a "release," and upon which, in the true sense of the term, it would properly operate. To a future owner of the soil there was nothing to be "released," in

the true and ordinary meaning of the term. If the intention was to cast upon him an estate in the minerals, there would be property or a title to be "granted" or "conveyed," in the true and ordinary sense of those terms. But the very nature of the term "release" or the phrase "hereby releases" implies the existence of a prior or superior right; and between the state and the future owner there was no such relation as created a prior or superior right for the state to "release."

[10] A full consideration of the question in all of its phases has brought us to the conclusion that it was not the intention of the framers of the original provision in 1866, or of the people who adopted the present Constitution in 1876, to give these terms a prospective operation and effect, so as to deny to the Legislature the power to provide for the reservation of minerals in future grants of the school and other public lands if, in their wisdom and the exercise of their province, such reservation was in accord with a sound public policy and best interests of the state. We recognize the rule that in general Constitutions and statutes operate prospectively; but the exception is as well established as the rule that they may operate retrospectively when it is apparent that such was the intention, provided no impairment of vested rights results. Grigsby v. Peak, 57 Tex. 146. It seems to us to be apparent that the authors of the original provision did not intend that it should have a prospective operation. Entirely aside from the question of the true meaning of the terms themselves, it is illogical to say that those who came after them, and but readopted the provision as it came from their hands, had a different intention; for to so hold is to deny to the act of readoption the purpose and effect that it inherently possessed. It is not the habit of the people or of lawmaking bodies to change the organic or statute law by the re-enactment of the same Constitution or statute. It is a sounder view to assume, as has been said before, that the object of a deliberate readoption of the original provision in the subsequent Constitutions was to extend the law to those periods, with the intent that it should have then the same operation and effect that it had at the time of its original adoption.

We do not overlook that in the opinion of the Commission of Appeals, in State v. Parker, 61 Tex. 267, it was said that under the provision of the 1866 Constitution all minerals were released to the owner of the soil, whether the grant was made before or after the time of its adoption. That part of the opinion, however, referring to subsequent grants was dicta, as the land there involved had been granted in 1847, and a determination of the effect of the provision upon the title to minerals in lands granted after its adoption was not necessary to the decision of the case.

[11] Since the present Constitution was adopted, as evidenced by different enactments beginning with the act of April 12, 1883, the Legislature has proceeded upon the view that it interposed no obstacle to legislation providing for the reservation of the minerals in these lands. While not binding upon the courts, an unchallenged construction of a provision of the Constitution by that department of the government extending over a period of more than a quarter of a century should be heeded and given effect, unless manifestly wrong. The same Legislature that enacted the statute before us likewise enacted the Revised Statutes of 1895, containing article 4041 in the same language as the constitutional provision, the effect of which was to release the rights of the state to all minerals in lands granted prior to 1895. But by this statute minerals in these lands thereafter granted were reserved to the state. We think the Legislature had the power to provide for such reservation as not opposed to the Constitution, and that the statute should be upheld.

The mandamus is refused.