MAGNOLIA PETROLEUM COMPANY V. J. H. WALKER,
COMMISSIONER OF THE GENERAL LAND OFFICE.

No. 6560.   Decided May 15, 1935.
Rehearing overruled June 26, 1935.
(83 S. W., 2d Series, 929.)

*W. H. Francis, A. S. Hardwicke,* and *Walace Hawkins,* all of Dallas, for relator.

The sale or repurchase of the section of land by J. R. Wilson in 1926 under the provisions of the 1925 Repurchase Act with reservations to the State of "one-sixteenth of the oil and gas and all (of) other minerals," in the event the first sale was with mineral reservation, does not reserve to the State of Texas the bonus and rentals subsequently contracted for by the purchaser under the terms of an oil and gas lease made upon the granted land, and that such lease is not the State's contract nor made pursuant to the terms of the Relinquishment Act, the covenants of which it may enforce. Boykin v. Southwest Texas Oil & Gas Co., 256 S. W., 581; Nations v. Miller, 107 Texas, 616, 183 S. W., 153; Johnson v. Robison, 111 Texas, 438, 240 S. W., 300; Pohle v. Robertson, 102 Texas, 274, 116 S. W., 1166; Buvens v. Robison, 117 Texas, 541, 8 S. W. (2d) 664.

*James V. Allred,* former Attorney General, *R. W. Yarbor-ough,* former Assistant Attorney General, *William McCraw,* Attorney General, *H. Grady Chandler,* Assistant Attorney General, for respondent.

It was the intention of the Repurchase Acts of 1925 and 1926 that the forfeiting owner of land should not repurchase a greater interest in the land or minerals than he had at time of forfeiture. Judkins v. Robison, 109 Texas, 6, 160 S. W., 955; Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655; Empire Gas & Fuel Company v. State, 121 Texas, 138, 47 S. W. (2d) 265; Lovett v. Simmons, 29 S. W. (2d) 1021.

*Homer C. DeWolfe,* of Austin, representing the State Board of Education, *Grisham Bros.,* of Abilene, *T. L. Foster, J. W.*

*Timmins*, *C. A. Toler* and *Martin A. Row*, all of Dallas, *Rex G. Baker*, of Houston, *Ben H. Powell*, and *Charles L. Black*, both of Austin, filed briefs and arguments as amicus curiae.

MR. JUSTICE SHARP delivered the opinion of the court.

Relator seeks a writ of mandamus to compel the respondent to cancel and set aside the order of cancellation and forfeiture of an oil, gas, and mineral lease, and that same be reinstated according to its terms, covenants, and conditions.

The controlling facts are as follows: That on and prior to March 17, 1909, the State sold and awarded to J. A. Ballou, at a price of $3.57 per acre, on a classification of "mineral and grazing," under the terms of the Land Sales Act, Chapter 47, Act of 1895, Chapter 129, Act of May, 1897, and the Acts approved April 19, 1901, and April 15, 1905, and May 16, 1907, Section 24, Block 50, Township 8, Certificate 4686, T. & P. Railway Co. Survey, located in Reeves County, Texas; that said land was public free school land, owned and held in fee simple by the State of Texas and its Public Free School Fund; that by proper conveyances on August 17, 1923, J. R. Wilson became the substituted purchaser of this land. On July 23, 1925, Wilson failed and refused to pay the interest due on the original sales price, and the Commissioner of the General Land Office, acting under the terms of the Act of 1925, Chapter 94, page 267, Acts Regular Session 39th Legislature, 22 Gammel's Laws, amended by Chapter 25, page 43, Acts First Called Session 39th Legislature, approved October 27, 1926, 24 Gammel's Laws, forfeited the original sale of the land. On July 28, 1925, the request was made of the Land Commissioner by Wilson, the owner thereof at the date of forfeiture, that the land be revalued, and the land was revalued at $2.00 per acre, as a substitute for $3.57 per acre, the forfeited price. This section was awarded to Wilson on April 5, 1926, on his application to repurchase the land at the new price of $2.00 per acre.

On November 15, 1927, Wilson and wife leased the whole section to P. G. Northrup, for $100.00 bonus and a delay rental of 50¢ per acre. The lease provided that if the State is entitled to 1/16 of the oil and gas, as provided in Article 5367, Revised Civil Statutes, 1925, "then it is agreed that the lessee may deduct ten cents (10¢) per acre per annum from rentals herein provided to be paid to lessor, and pay same to the State and out of the royalties herein provided to be paid to lessor, lessee may pay the State such portion to which the State is entitled not to exceed one-sixteenth (1/16) of the oil and gas or the

value thereof." On November 21, 1927, Northrup assigned the lease to the Humble Oil & Refining Company, and that company assigned the north half of the lease to R. R. Penn. On March 30, 1929, Penn assigned to the relator the oil and gas lease of November, 1927, in so far as the same covered the N. W. one-fourth of the section of land here involved. The original lease was for ten years.

Northrup paid to the State the sum of $64.00 on November 23, 1927, same being initial bonus at the rate of ten cents per acre. On October 27, 1928, the Humble Oil & Refining Company, as assignee, paid $64.00 rental on said oil and gas lease, same being one year's rental at ten cents per acre. The Humble Oil & Refining Company paid to the General Land Office $32.00 on November 7, 1929, and $32.00 on November 5, 1930, as rentals on the south half of the section, each payment being for one year at the rate of ten cents per acre per annum. On October 17, 1929, relator paid to the General Land Office $40.00 as rental on the oil and gas lease on the N. W. quarter of the section of land in controversy, same being at the rate of twenty-five cents per acre per annum, being one-half of the amount of delay rentals stipulated in the original lease. On October 22, 1930, relator made a like payment of $40.00, but on October 21, 1931, relator paid $16 as the delay rentals for one year on this quarter section of land, said payment being made on the basis of ten cents per acre per annum. On October 22, 1932, relator paid $40.00 as delay rentals on this quarter section of land, said payment being made at the rate of twenty-five cents per acre per annum.

Relator's lease on this quarter section was forfeited by the Commissioner of the General Land Office on July 28, 1933, for failure to pay the full amounts due under said lease.

The original sale of this land, made in 1909, was on a classification of mineral and dry grazing. On forfeiture under the Act of 1925, the official revaluation did not carry the classification of the land. No classification of this land was made by the Commissioner of the General Land Office in the repurchase of this land by Wilson. The application, the obligation, and the application wrapper stated that the lands were being repurchased under the provision of the Act of 1925, and the grantee's obligation provided: "And it is expressly understood that I am to comply strictly with all the conditions, limitations and requirements, and am subject to and accept all the penalties contained and prescribed in said laws."

Relator contends that J. R. Wilson having repurchased

434

under the terms of the Act of 1925, under the conditions of his repurchase thereunder he became, and still is, the owner of the surface estate and 15/16 of all the oil, gas, and minerals in and under section 24 above described, and entitled to complete said purchase by compliance with the obligations and covenants therein contained, and to receive thereupon the full fee simple title and patent to the surface estate, and 15/16 of all the oil, gas, and mineral estate thereunder. That by the terms of said Act, and the covenants and obligations of the sale of said land, the State of Texas and its Public Free School Fund reserved and holds title and ownership in and to 1/16 of the value of the oil, gas, and other minerals that may be discovered, produced, and marketed from said land. Relator also contends that the oil and gas lease is now, and was at the time of the alleged unlawful acts of the respondent, Hon. J. H. Walker, in full force and effect, and that relator was the owner of same in so far as it covers the N. W. quarter of said section, and vested with the oil, gas, and mineral leasehold estate, with the corresponding 7/8 working interest in and to the oil, gas, and other minerals in and under this land. That neither oil nor gas nor other minerals have been discovered, produced, or marketed from this land, nor has any well therefor been commenced thereon; that the 50¢ per acre annual delay rentals payable on November 15, 1928, 1929, 1930, and 1931 have been regularly and timely paid to J. R. Wilson and wife, as well as the $100.00 down bonus payment therein contracted for.

Relator further charges that Hon. J. H. Walker is asserting that the State of Texas and its Public Free School Fund is entitled to one-half of the contractual bonus and annual delay rentals as contracted for in said lease; that said respondent has demanded that this relator pay one-half of the bonus and accrued delay rentals therein, as provided in Articles 5380 and 5381, R. S., 1925, and that such payments are secured by a first lien upon the oil, gas, and mineral estate. That this relator having heretofore failed and refused to pay the State and its Public Free School Fund the proportionate one-half of the bonus and one-half of the accrued annual delay rentals due and payable on the N. W. quarter of this lease, the respondent acting in his official capacity did undertake to forfeit and declare the lease invalid and forfeited as to the N. W. quarter of this section of land, acting under the terms and provisions of Article 5372, et seq., R. S., 1925.

Relator further contends that in the event the lease covering the N. W. quarter of this section of land includes any oil, gas,

or mineral interest or estate therein, held, reserved and owned by the State and its Public Free School Fund, then relator says that no portion of said contractual bonus, down payment, or delay annual rentals therein stipulated for, was reserved, held, or owned by the State and its Public Free School Fund, either by the terms of said Repurchase Act of 1925, or under the terms and provisions of the award and sale of this land, nor is any bonus, down payment, or delay rentals contracted for or due and payable to the State and its Public Free School Fund under the terms of this lease. That respondent by his acts in undertaking to cancel and forfeit this lease acted without the authority of law, and that said lease is in all things a valid and enforcible contract, and that relator has a legal right to the reinstatement of same, and to have the alleged forfeiture and cancellation set aside.

Respondent contends: (1) That mineral classified school lands forfeited and repurchased by the forfeited owner under the Act of 1925 and its amendment of 1926 are repurchased with the reservation to the State of all the minerals in the land; that no power of reclassification was granted to the Land Commissioner by the Act of 1925, and that every forefeited and repurchased owner repurchased his land with its mineral status unchanged, and upon the same mineral classification and with the same title, rights, and privileges as existed prior to the forfeiture and repurchase.

(2) That the Relinquishment Act, articles 5367, et seq., R. S., 1925, is applicable to these resales made after the passage of that Act; that the purchaser of such mineral classified lands obtained no title to the minerals under the Relinquishment Act, but was merely designated as an agent to lease the lands for the State, and that all such leases so made by surface owners as agents of the State under that Act entitle the Permanent School Fund to one-half of all bonuses and rentals, in addition to the ten cents per acre per annum provided for in the statute.

(3) That the lease in question was forfeited under authority vested in the Commissioner of the General Land Office by Article 5372, Revised Civil Statutes of 1925. This statute provides that forfeiture may be set aside, and all rights theretofore existing reinstated, at any time before the rights of another intervene, upon satisfactory evidence of future compliance with the provisions of the Relinquishment Act. Respondent here offers to set aside the forfeiture and reinstate this lease, upon payment by the relator of all past due rental installments and upon a statement of future compliance with the

provisions of the Relinquishment Act applicable to this lease.

Decision of this cause turns on the construction of the Act of 1925. This Act was amended in 1926, at the First Called Session of the 39th Legislature, Chapter 25, Acts of October 27, 1926, but this amendment does not affect the question before us.

Relator contends that this Act is clear and explicit, and that the owner of such land at the date of forfeiture shall be given a preference right, within a limited time, "to repurchase upon the terms and conditions prescribed in this act." On the other hand, the respondent contends that, in view of the public policy of the State with respect to minerals, and the lack of clarity in this Act, all leases forfeited and repurchased must be construed in connection with the Relinquishment Act. Articles 5367, 5368, et seq., R. S., 1925.

Many laws have been enacted respecting public lands and the minerals therein. The details of those laws will not be related here. To do so would be to extend this opinion beyond its proper limits. To one who will study the extent and intricacies of our school land laws, and the purposes for which they were enacted, it is quite obvious that they were not always clear in their meaning. This situation is explained when we consider that our school land laws have been to a large extent patch-work, each law being cumulative of the other, and no new law repealing a prior law, unless clearly repugnant to the prior law. The task before the legislature was a stupendous one, and many laws were passed with a view to sell the public lands, and at the same time protect the rights of the purchaser, as well as the rights of the public. Many duties were, and are, placed upon the Commissioner of the General Land Office to carry out the enforcement of the laws. At the time of the forfeiture in question, Hon. J. H. Walker was, and is now, Commissioner. He has been connected with the Land Office for a long period of time, and has rendered distinguished services as Chief Clerk and as Commissioner, which services make him familiar with the laws and the public policy of the State relating to the public lands and minerals. He construed the Act of 1925 to mean that the forfeiting and repurchasing owner acquired no greater rights in the oil and gas in the land than he had at the time of the forfeiture.

As early as 1883 the legislature made provision to classify public lands and sell the agricultural land to settlers; and the minerals thereunder were "reserved by the State for the use of the fund to which the land now belongs." See Act of April 12,

1883; 9 Gammel's Laws, 394; 31 Tex. Jur., p. 659. With changes in the law, made from time to time by the legislature, the idea of reserving minerals to the State has been uniformly followed, and it is now incorporated in Article 5310, R. S., 1925. This article provides that all lands included in this chapter dedicated to the public free schools and the various asylums "shall be sold with the reservation of the oil, gas, coal, and all other minerals that may be therein, to the fund to which the land belongs, and all applications shall so state."

The law furnishes certain fundamental rules for the sale of public lands. Chapter 3, Art. 5306, et seq., R. S., 1925. To place public lands on the market the following steps must be taken: (1) The date must be fixed (Article 5309); (2) It must be classified either as grazing or agricultural, or as grazing and mineral, or agricultural and mineral, and valued (Article 5310); (3) It must be advertised (Article 5311); (4) An application to purchase, accompanied by money to pay for the land, must be filed (Article 5312); (5) Article 5313 sets out how the applications must be opened, etc.; (6) Article 5315 regulates the payments; (7) Article 5316 provides for the notice of sale to county clerk; (8) Article 5317 regulates the issuance of awards; (9) Article 5319 regulates form of payments and their disposition; (10) Article 5320 regulates interest payments; (11) Article 5326 provides for the forfeiture of lands for nonpayment of interest. This article provides that under certain conditions the forfeiting owner may reinstate his purchase.

1 The Relinquishment Act was passed in 1919. The prior laws passed for the protection and development of minerals belonging to the State had not proved practical or satisfactory. This Act was construed to mean that the oil and gas in place shall not vest in the owner of the soil as his property, but that he shall receive certain interests in the minerals when a valid mineral lease has been executed by the owner of the surface estate, as the agent of the State, in accordance with its terms. The Relinquishment Act has been construed by this Court in the following cases: Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655; Empire Gas & Fuel Co. v. State of Texas, 121 Texas, 138, 47 S. W. (2d) 265; Lamar v. Garner, 121 Texas, 502, 50 S. W. (2d) 769.

It was said in the Empire Gas & Fuel Company case, in speaking of the Relinquishment Act:

"By the provisions of this act, the State constitutes the owner of the soil its agent to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein,

upon such terms and conditions as such owner may deem best, subject to the conditions that 1/16 of the gas and oil in case of production as royalty and 10¢ per acre per year as rental and like amounts to the owner of the soil shall be paid the State by the lessee."

In the case of Lamar v. Garner, supra, in discussing the Relinquishment Act, it was said:

"In other words, it logically follows that by the language used in this Act, as construed by the Supreme Court, the State is to receive as a minimum for the sale of the gas and oil 1/16 of all gas and minerals as royalty and 10¢ per acre per annum as rental and all amounts received over and above the foregoing amounts shall be equally divided,—½ to be received by the State and ½ to be received by the owner of the land for his services in making the lease as the agent of the State during the term of the lease."

2   Let us analyze the Act of 1925. It provides that purchasers of public free school land, where the sales have been forfeited on account of their failure to pay their interest to the State, are given a preference right, within a limited time, to repurchase the land. Section 3 provides that if the owner fails to exercise his right to repurchase the land, "the Commissioner shall again place the land on the market for sale, as it now or may hereafter be provided for the sale of public free school lands. All repurchasers under this Act shall be subject to the obligation of interest payments and forfeiture for nonpayment of interest that is now provided by law for other purchasers of public free school lands." Section 4 reads:

"Whenever any land affected by this Act is repurchased under the rights of repurchase given herein, any lien, legal or equitable, and any valid contractual rights in favor of any person or persons existing against, in and to said land or any part thereof at the time of forfeiture shall remain unimpaired and in full force and effect as if no such forfeiture had occurred."

3   But it is vigorously contended that because of the following provision of the Act it was intended to grant the purchaser 15/16 of the oil and gas and all other minerals in the land, and reserve to the State for the School Fund only 1/16 of the minerals described therein. The provision reads as follows:

"One-sixteenth of the oil and gas and all other minerals in the land included herein, whether known or unknown, are expressly reserved to the Public Free School Fund in the event the former sale was with mineral reservation."

This is all that is said in the Act as to what interest the purchaser shall have in the minerals in the land repurchased. The Act does not provide means for protecting the minerals belonging to the State in the following particulars: (1) No one is authorized to act for the State in contracting with reference to the minerals reserved; (2) no method is adopted for protecting and developing such mineral rights; and (3) no power is given the Commissioner of the General Land Office to reclassify this land, except in those cases where the forfeiting owner fails to exercise his right to repurchase.

In construing the Act of 1913, (Chapter 160, page 336, Acts of the 33rd Legislature), this Court, in the case of Johnson v. Robison, 111 Texas, 438, 443, 240 S. W., 300, held that the word "valuation" did not include "classification,"—and that the power granted the Land Commissioner to value did not carry with it the power to classify. It is shown that for a long period of years the ordinary instruments of purchase and sale of public school lands have shown the classification of the land, whether "grazing," "agricultural," "timber," or "mineral," or a combination of classifications. Under the Act of 1925 the Land Commissioner was powerless to change any classification, and he made no attempt to go beyond its terms and change the classification which a forfeited sale bore. The present Land Commissioner construed the Act to mean that the surface estate was sold as provided for therein, and the mineral estate was reserved as it had theretofore existed under the General Sales Law (Chapter 3, Title 86, R. S., 1925), and the Relinquishment Act (Article 5367, et seq., R. S., 1925).

Relator contends that the Act of 1925 definitely fixes the rights and interests of the State and the repurchaser in the land and minerals forfeited and repurchased thereunder, and that the Act granted to the repurchaser of the forfeited land 15/16 of the minerals and the entire surface estate, leaving to the State only 1/16 of the oil and gas; and that this Act is not to be construed in connection with other statutes relating to oil and gas belonging to the Public Free School Fund. If this contention should be sustained, then we would be confronted with the following questions: (1) Under what law would the Commissioner of the General Land Office find the power to classify the land should it be known as mineral bearing; and (2) Where would he find the method prescribed for protecting and developing such mineral rights reserved to the State, if the Act of 1925 is considered an independent sales Act? The answers cannot be found in this Act, because it is absolutely silent upon

these questions. Therefore resort must be had to other laws relating to mineral rights reserved to the State.

With the foregoing articles of Chap. 3, Title 86, R. S., 1925, unrepealed, evidently the intention of the legislature in passing the Act of 1925 was to give the forfeiting owner an alternative remedy of repurchasing the land at a price fixed by the Land Commissioner. It appears to be clear that if the owner fails to pay his interest, and the Land Commissioner declares a forfeiture, the forfeiting owner, if the land was forfeited for interest accumulated prior to November 1, 1925, could pursue one of two courses to retrieve the land: First, he could pay the back interest, and the sale would be reinstated as if no forfeiture had accrued; or second, he could ask the Land Commissioner to appraise the land, and repurchase it at a price fixed by the Commissioner.

This Act further appears to be an expansion of Article 5326, providing for an additional manner of retrieving forfeited land. The Land Commissioner is relieved of the duty of reclassifying the land, nor is he required to fix a date, nor to advertise the land; and the terms of sale are exactly the same in the repurchase as in the original sale; and the law as it stood at the time of the enactment of the Act of 1925 must be looked to for the terms of the sale and for the pains and penalties imposed by the law for failure to comply with it.

4 No inflexible rule can be announced for the construction of statutes. However, the dominant rule to be observed is to give effect to the intention of the legislature. Generally the intent and meaning is obtained primarily from the language of the statute. In arriving at the intent and purpose of the law, it is proper to consider the history of the subject matter involved, the end to be attained, the mischief to be remedied, and the purposes to be accomplished. See 59 C. J., §570, p. 958. "Where, however, the language of the statute is of doubtful meaning, or where an adherence to the strict letter would lead to injustice, to absurdity, or to contradictory provisions, the duty devolves upon the court of ascertaining the true meaning. If the intentions of the legislature cannot be discovered, it is the duty of the court to give the statute a reasonable construction, consistent with the general principles of law." 59 C. J., p. 957, §569; Empire Gas & Fuel Co. v. State, supra.

5 The history of our laws covering a long period shows that the State has provided a method for the development of its minerals,—usually on a royalty basis of some kind. In this

Act we find no power for classification of the land and minerals, and no method adopted for developing the minerals reserved to the State. Under the doctrine contended for, the purchaser of the surface estate would receive 15/16 of the oil and gas, and could use and develop same, and leave the State without any method of protecting and developing its interest in the minerals. We cannot conceive that the legislature intended to leave minerals belonging to the Public Free School Fund in such an uncertain condition, or it would have indicated that intention in plain and unmistakable language.

In construing statutes which involve the granting of rights and privileges by the State, the following rule should be observed: "Legislative grants of property, rights, or privileges must be construed strictly in favor of the State, * * * and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the State." Empire Gas & Fuel Co. v. State, supra; Lewis' Sutherland on Satutory Construction, vol. 2, §548; Dolan v. Walker, 121 Texas, 361, 49 S. W. (2d) 695; Coosaw Mining Co. v. State, 144 U. S., 550, 36 Law Ed., 537; Central Transportation Co. v Pullman Palace Car Co., 139 U. S., 24, 11 S. Ct., 478, 35 Law Ed., 55; Shively v. Bowlby, 152 U. S., 1, 38 Law Ed., 331; 39 C. J., pp. 1122, 1123, §664; 36 Cyc., p. 1177; 18 R. C. L., p. 1220.

When we recall the extent of the vast public domain originally owned and held by the State for the benefit of the public, the great bodies of public lands that have been appropriated and dedicated to the Public Free School Fund, to counties, to asylums, and to the State University and its branches; also, when we recall that within the last few years valuable minerals have been discovered underlying this land, and the task imposed upon the legislature to safeguard by the enactment of proper legislation the rights of all concerned with respect thereto, the wisdom of the foregoing rule is clearly mainfest.

It will be noted that nowhere in this Act is there found language purporting to repeal any prior laws. We look in vain to find in this Act where forfeitures were threatened because of the status of the mineral title to the land. The threatened forfeiture against the land owner from which relief was sought was for failure to pay past due interest on his purchase of the surface estate. On lands classified as mineral there had been no sale of the mineral estates to the owner of the surface estate, and he was in no danger of losing any right in the minerals, except through forfeiture of his surface estate for fail-

ure to pay interest on his surface sales contract. The Act of 1913 gave the forfeiting owner the right within a certain time after notice of classification and appraisal of his land to repurchase same. The Act of 1925 provides for appraisal only. Under the latter Act it is not shown that the surface estate owner was in distress on account of the mineral estate, but, on the contrary, it states the reasons for the passage of same as being: (1) several consecutive years of drouth; (2) demoralized condition of the cattle business; (3) purchasers financially unable to pay interest; and (4) nonpayment of interest and forfeiture would work a great loss to the available School Fund.

6 Furthermore, when we review the history of legislation upon this question, and the many laws enacted relating thereto, keeping before us the rules governing the construction of statutes of this nature, considering the Act of 1925 as a whole in order to ascertain the intention of the legislature expressed therein, and giving it a liberal construction, it cannot be construed that the legislature intended to adopt as the policy of this State, with reference to minerals belonging to the Public Free School Fund, that the surface owner of the land, without classification, would also acquire 15/16 of the oil and gas thereunder, and leave no method for the State to protect and develop its interest in the minerals reserved. If the legislature had intended to announce such policy, it could have done so in plain and unequivocal language. It was not done. On the contrary, it is clear from the Act, taken as a whole, that the legislature had no intention of granting or conferring upon the repurchaser any greater interest or rights in the oil and gas in the land then he had at the time of forfeiture of the original sale.

The Commissioner of the General Land Office correctly refused to set aside his order cancelling relator's oil, gas and mineral lease, and the petition for mandamus is refused.

Opinion delivered May 15, 1935.

Rehearing overruled June 26, 1935.