

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Hon. Bascom Giles, Commissioner
General Land Office
Austin, Texas

Dear Sir:

>                    Opinion No. O-3675
>                    Re: Status of minerals in
>                        land recovered in
>                        Capitol Syndicate
>                        case" and sold under
>                        1923 act.

On June 10, 1941 you requested an opinion of
this department on the following questions:

> "1. What is the correct mineral res-
> ervation in sales of Capitol
> Syndicate land made prior to
> March 28, 1925, the effective
> date of Chapter 130, Acts of
> the 39th Legislature?
>
> "2. If this reservation is of all
> the minerals, is there any man-
> ner in which Mr. McDougald could
> execute a lease on this land
> under the Relinquishment Act as
> agent of the State?"

You related the following facts in connection
with your request:

> "On January 2, 1925, Morgan Jones filed
> his application to purchase Sec. 16, Block C3,
> Public School Land in Dallam County, which was
> a part of the Capitol Syndicate Lands. This
> tract was awarded to him on March 12, 1925.
> The purchase was under Chapter 106, Page 222
> of the General Laws of the 38th Legislature,
> 1923. This Act reserved one-eighth of all oil

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Hon. Bascom Giles, Commissioner - page 2

and gas to the State. This tract of land was later forfeited, on June 16, 1932, and was repurchased on application by Jones filed in this office on March 9, 1938, and was awarded to him on March 14, 1938. This repurchase was under the Act of the 45th Legislature of 1937, being Chapter 332, H. B. 275 of said Acts. Later, Jones sold this tract of land to A. McDougald, who obtained a patent covering the land, on January 12, 1940. Because of certain ambiguities in the law, which will be brought out later, the mineral reservation in the patent covering this land was set out in the following manner:

> "'Minerals in the above described land are reserved to the State as prescribed by law.'

"McDougald still later sold the land to the United States Government for conservation purposes. Their intention was to retire this land from cultivation to eliminate excessive blowing. In the deed from McDougald to the United States Government, the following reservation was inserted:

> "'There is hereby excepted and reserved from the foregoing conveyance, unto the grantor, his successors, heirs and assigns, whatever interest, if any, the grantor may now have in all oil, gas and other minerals, under and upon the above described land for a period of fifty (50) years, beginning October 24, 1938, and ending October 23, 1988, provided said grantor now has the power to reserve said interest, according to law, and if he does not have such power, then this reservation shall be null and void, said reservation, if any, to be subject to the following rules and regulations, to-wit:' (A copy of the whole instrument is attached hereto)

"The next development in chronological order is that McDougald now has an opportunity to lease the land for oil and gas development. Attorneys for his prospective lessee have questioned the status of the minerals under the land and McDougald's power to lease it under the reservation quoted above. Mr. McDougald, through his agents, has requested that this office endeavor to clarify the situation."

Chapter 106, page 222 of the General Laws of the Thirty-eighth Legislature, 1923, under which the land in question was originally purchased from the state provided, in part, as follows:

"Sec. 3. The sale of said land shall be upon the express condition that one-eighth of all the oil and gas, whether known or unknown, and the value of same and all of all other minerals of whatsoever kind, whether known or unknown, that may hereafter be found on or under said land and the value of same, shall be reserved to the State and said portion of oil and gas and the value of same, together with all other minerals, and the value of same, are hereby donated to the said School Fund. Said oil and gas and other minerals shall be subject to be developed in the manner that is now, or that may be hereafter, provided by law."

When the land was repurchased under Chapter 332, page 665 of the Act of the Forty-fifth Legislature, Regular Session, 1937, which provides, in part, as follows:

" * * * , and that notice of the reappraisement shall be given to the former owner or owners, who shall have a preference of ninety (90) days after the date of notice to repurchase the same upon the terms and conditions provided in Chapter 94, Page 267, Acts of 1925, as amended by the Acts of 1926, Thirty-ninth Legislature, First Called Session, Chapter 25, Page 43. * * * "

The repurchaser secured the same interest and title in the minerals that was secured by the original

purchaser under the 1923 Act and the State reserved the
same interest and title in the minerals which it reserved
in the original sale under the 1923 Act. This question
was decided by the Supreme Court in the case of MAGNOLIA
PETROLEUM COMPANY vs. WALKER 83 S.W. (2d) 929 in which
the construction of Chapter 94, Page 267, Acts of the
Regular Session of the Thirty-ninth Legislature, 1925,
and the amendment thereto by Chapter 25, Page 43, Acts
of the First Called Session of the Thirty-ninth Legislature,
1926, were involved. Justice Sharp speaking for the court
used the following language:

> "On the contrary, it is clear from the
> Act, taken as a whole, that the Legislature
> had no intention of granting or conferring
> upon the repurchaser any greater interest or
> right in the oil and gas in the land than he
> had at the time of forfeiture of the original
> sale."

The Act of 1937, above referred to, insofar as
the questions involved in your request are concerned, added
nothing to the Acts of 1925 and 1926, above referred to,
other than to make those Acts applicable to the land in
question.

The real question then left to be decided is as
to what is the status of the minerals in land purchased
from the state under the Act of 1923, above referred to.

It is the opinion of this Department that the
purchaser of the land in question received fee simple title
to the surface and seven-eighths (7/8ths) of the oil and
gas, and that the state reserved for the School Fund one-
eighth (1/8th) of all of the oil and gas in the nature
of a free royalty and all of all other minerals; that
the purchaser may sell or lease all or any part of his
interest in the oil and gas or he may sell the surface
and reserve all or any part of his interest in the oil
and gas, but the owner or owners of the seven-eighths
(7/8ths) of the oil and gas in the event of production
from the land in question, must turn over to the state for
the use of the Permanent free school fund one-eighth (1/8th)
of all of the oil and gas produced or the value of same
free and clear of any cost of development and production.
In case of a lease by the land owner or his assigns of the
minerals, it shall be subject to the one-eighth (1/8th)
free royalty in favor of the state for the use and benefit of the

Hon. Bascom Giles, Commissioner - page 5

Permanent free school fund, but the state will not be entitled to participate in the cash bonus or rentals which might be provided for in said lease.

It is true that in an ordinary transaction where a one-eighth (1/8th) of the oil and gas or other minerals is reserved in a sale as distinguished from a lease the one reserving the one-eighth (1/8th) interest, unless otherwise provided, will be a necessary party to the execution of a lease of the minerals and will be entitled to receive his share of the bonus and rental, and if the land is leased reserving the ordinary one-eighth (1/8th) royalty such persons will only actually receive the value of one sixty-fourth of all of the oil and gas since seven-eighths (7/8ths) will be turned over to the lessee for development and production purposes. But in no instance has the Legislature, where a reservation of the oil and gas has been made, reserved less than one-sixteenth (1/16th) of the total production to the state. The Act of 1923, under which the land in question was originally sold, after providing for a reservation of one-eighth (1/8th) of all of the oil and gas used the phrase "and the value of same" indicating an intention, we think, that the permanent free school fund should receive one-eighth (1/8th) of the gross value of all the oil and gas produced from the land in question. It is true that the reservation is not as clear as that set out in the Sales Act of 1931 being Section 4 of Article 5421c, Vernon's Annotated Civil Statutes, where the reservation was referred to "as a free royalty to the state". If we concede that it is not clear that the Act of 1923 intended to reserve to the state one-eighth (1/8th) of the oil and gas to be delivered to the state free and clear of all expenses and in the nature of a free royalty, then same must be construed to have that meaning as it is the most favorable one to the state. EMPIRE GAS & FUEL CO. vs. STATE, 47 S.W. (2d) 265, Supreme Court of Texas, in an opinion by Judge Sharp, the court said:

"The rule is well settled that legislative grants of property rights and privileges must be construed strictly in favor of the state on grounds of public policy and whatever is not unequivocally granted is in clear and explicit terms withheld. Any ambiguity or obscurity in the terms of the Statutes must operate in favor of the state."

We are of the opinion that the status of the purchaser's rights under the Acts of 1923, above referred to, are

the same as the rights of a purchaser under the Act of 1931 which is now Section 4 of Article 5421, Vernon's Annotated Statutes with respect to the oil and gas except that in the first instance the state reserves a one-eighth (1/8th) and under the 1931 Act it reserves a one-sixteenth (1/16th).

The case of WINTERMAN vs. MCDONALD, 102 S.W. (2d) 167 by the Supreme Court of Texas determines the status of the minerals under the 1931 Act as between the state and the purchaser and in doing so used the following language:

"We think that the Legislature intended that the purchaser of land subject to sale under this Act shall acquire such land and the minerals therein, but that there shall be reserved to the state one-sixteenth (1/16th) of all minerals as a free royalty to the state except as to sulphur and other mineral substances from which sulphur may be derived or produced and to these a one-eighth (1/8th) thereof shall be reserved as a free royalty to the state.

"The royalties reserved by the state under the provisions of this law constitute a fee in the minerals in place and will follow the land * * * the term 'free royalty' introduced into this Act must mean that the interest reserved to the state in the minerals produced on school land sold under the terms of the Act must not bear any part of the expense of the production, sale or delivery thereof. The owner of the land acts as the agent of the state in making the mineral leases. This calls for the exercise of a duty by the land owner to the state. The land owner owes to the state good faith in the performance of a duty which he has assumed and he should discharge that duty with prudence and good faith and with ordinary care and diligence."

The last portion of the above quoted portion of the opinion would seem to indicate that the owner of the land could not sever the minerals from the surface estate, but when we consider the Act along with all of the opinion of the court, it seems inescapable that since the purchaser acquires fee title to the surface and a portion of the minerals that there is no restriction on his right to alienate either the surface or the minerals or a part thereof, and create a severance of the minerals granted from the surface so long as the owner of

the interest in the oil and gas granted in good faith protects the right of the state in its interest in the royalty and minerals which it reserves. In the opinion where the owner of the land is referred to it assumes that the purchaser still holds all of the interest which he secured from the state under the purchase. We do not think such language could be construed as holding that the purchaser could not sever his minerals from the surface estate. Our opinion is not in accord with some of the language used in the case of Stallcup v. Robison, 300 S.W. 25 but the court concludes its opinion with the following statement:

"We decide but one thing, and that is that since the act of 1925, supra, became effective, the capitol syndicate lands are to be sold with a reservation of all oil and gas to the state, and that the capitol syndicate lands will fare just as all other public school lands fare. Since this is true, its oil and gas are to be developed under the general permit statute (Rev. St. 1925, art. 5338 et seq.). This permit was issued in 1926, after the act of 1925 became effective, and the general permit law was concededly followed by relator.

"Therefore we recommend that the mandamus issue as prayed for by relator."

The land inquired about in your request was sold prior to the effective date of the act of 1925, and we believe as to it, the Supreme Court would not follow the dictum in the Stallcup case since its opinion in the WINTERMAN vs. MCDONALD case, but would apply the reasoning in the latter case.

We trust that this sufficiently answers your request.

Yours very truly

ATTORNEY GENERAL OF TEXAS

APPROVED AUG 18, 1941

ATTORNEY GENERAL OF TEXAS

By:

D. D. Mahon
Assistant

DDM:fs
Encl.



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN