**The STATE of Texas, Appellant,**

v.

**APOLLO TRANSPORTS, INC., Appellee.**

**No. 8408.**

Court of Civil Appeals of Texas, Beaumont.

Feb. 28, 1980.

Rehearing Denied March 19, 1980.

R. Lambeth Townsend, Asst. Atty. Gen., Austin, for appellant.

Bill R. Jones, Livingston, for appellee.

KEITH, Justice.

The State appeals from an adverse judgment entered after a bench trial wherein it had sued for civil penalties and injunctive relief in its effort to enforce compliance with the provisions of the Texas Motor Carrier Act, *Tex.Rev.Civ.Stat.Ann. art. 911b (1964)* and as amended *(Supp.1980)* ("Act").

The State alleged that the defendant had acted unlawfully on eleven separate days by transporting wood chips for compensation or hire over the public highways in commercial vehicles and trailers other than those authorized by the Railroad Commission in a Specialized Motor Carrier (SMC) Certificate owned by Apollo.

The parties stipulated to the fact that Apollo had transported wood chips over the public highways upon the dates alleged and that it owned the certificate mentioned in State's pleadings. The record of the hearings in 1960, at which time the particular certificate was granted to Apollo's predecessor in title, was admitted by stipulation; and, the parties agreed that photographs of Apollo's equipment tendered by Apollo could be received in evidence.

The certificate owned by Apollo authorized it to transport "DRY COMMODITIES IN BULK", including wood chips, in "tank vehicles, hopper vehicles, hydraulic unloading dump vehicles, cable unloading dump vehicles, and tank type gravity unloading dump vehicles."

In addition to the stipulations, two witnesses testified at the trial. The State offered Lavan Watts, a graduate mechanical engineer and Chief Engineer of Lufkin Industries, Inc., Trailer Division, a manufacturer of truck and trailer bodies. Mr. Watts qualified as an expert witness as to the various types of equipment and testified that the equipment used by Apollo was *not* the type of equipment specified in the certificate.

The testimony of Apollo's president, William Lynch, a lawyer, former hearing examiner of the Railroad Commission and experienced in the trucking industry, while differing from that of Watts, did not specifically address the question. The thrust of the testimony of Mr. Lynch was that his vehicles became "dump" vehicles when, with fixed equipment supplied by the consignee, the vans could be unloaded; and, the type of van used by Apollo was safer and more economical in operation.

The sole question is whether Apollo's operation conformed to the restricted scope of the authorization contained in the certificate. The answer to this question, in turn, depends upon whether Apollo's certificate required its vehicles to be equipped with internal and self-operating devices for dumping the chips at the destination—or— simply permitted the use of equipment which could be dumped by permanently fixed devices upon the grounds of the consignee.

Although there are many cases construing the Act, the parties have not cited us to a single appellate opinion which has addressed the narrow question posed.

The statute has been held to be a comprehensive regulatory act designed to regulate all aspects of the commercial use of the Texas highways, including the prevention of unregulated competition. *Steele v. General Mills, Inc.,* 329 U.S. 433, 440, 67 S.Ct. 439, 443, 91 L.Ed. 402, 408 (1947); *Oil Field Haulers Ass'n, Inc. v. Railroad Commission,* 381 S.W.2d 183, 194 (Tex.1964).

The holding of the Supreme Court in *Magnolia Petroleum Company v. Walker,* 125 Tex. 430, 83 S.W.2d 929, 934 (1935), was summarized in *Dye Trucking Company v. Miller,* 397 S.W.2d 507, 511 (Tex.Civ.App.— Austin 1965, writ ref'd n. r. e.):

"Grants of property rights or privileges by legislative act such as the right to transport certain commodities for hire must be construed strictly and whatever is not unequivocally granted in clear and explicit terms must be considered withheld."

In *State v. Bilbo*, 392 S.W.2d 121 (Tex. 1965), Bilbo had changed the methods of his operation to conform to modern developments and procedures, i. e., the use of palletizing and fork lift trucks in the "unitizing" of heavy loads of products formerly transported as units. The Court, addressing a similar question to that before us, held:

"First, we hold that the intention of the Railroad Commission as expressed in Bilbo's certificate is a question of law. In arriving at a construction of the certificate we may take into consideration Bilbo's application and the order of the Railroad Commission." (392 S.W.2d at 122).

In *Dye Trucking Company v. Miller*, supra, the Court noted that under the Act, Sec. 5a(c)2, the application for the permit must have contained " 'the description of each vehicle which the applicant intends to use.' " While our record does not contain the application of Apollo's predecessor, we indulge the presumption that it conformed to the statutory requirement and that the Commission granted no more nor less than was sought.

From our examination of the record, and particularly the testimony of Watts along with the photographs offered by both parties, we find, as a matter of law, that the van type trailers operated by Apollo did not comply with the certificate. The vans were not "tank vehicles" nor were they "tank type gravity unloading dump vehicles." Apollo makes no contention that its vans were equipped with any hydraulic mechanisms or cables which converted such vehicles into "hydraulic unloading dump vehicles" or "cable unloading dump vehicles."

According to Mr. Watts, none of Apollo's vans was a "hopper vehicle." * Instead, all of Apollo's vans were simply rectangular flat bed trailers with high sides, and when filled with chips, the unit was covered with a tarpaulin to prevent loss of the cargo. None of the vans was equipped with any type of chain or hydraulic mechanism so

that the van could be unloaded by power sources inherent in the tractor-trailer unit. Instead, Apollo's vans could be unloaded only by the use of hydraulic or cable operated facilities provided at the discharge point which were no part of its vehicles.

Apollo's SMC certificate was granted after a lengthy hearing extending from September to December, 1960, involving many applicants. From this record, we learn that one of the applicants, Robertson Tank Lines, had in use van type vehicles which did not have internal dumping mechanisms. Likewise, we note that Watts testified that van type vehicles similar to that now used by Apollo came into common use about 1955, before the hearing mentioned. It seems apparent, therefore, that when the Commission chose to define the type of vehicle authorized for use by Apollo's predecessor, it chose apt language. Such a construction of the permit is in harmony with the rule laid down in *Dye Trucking Company v. Miller*, supra (397 S.W.2d at 511).

If, as Apollo contends, the operation of the vehicles upon the highways authorized by its certificate is dangerous to its employees or the public generally, or that such operation cannot be conducted economically, the solution is to procure an amendment of the certificate to authorize use of van type equipment. It cannot, because of its own unilateral determination, substitute unauthorized equipment for that authorized by its certificate.

Upon the undisputed record, the trial court should have granted the relief sought by the State in its pleadings. Ordinarily, we would not only reverse the judgment of the trial court but would render the judgment which should have been rendered.

However, the trial court is the proper forum to grant injunctive relief and is equipped to enforce the provisions thereof; consequently, we are of the opinion that it would be appropriate for the trial court, and not this intermediate appellate court, to

---

* Watts' definition: "A hopper vehicle would be one that consists of a triangular shaped device that allows for unloading the commodity, and the hopper would be located between the forward part of the running gear, and to the rear of the landing gear, for discharging the commodity between those two points into—from this hopper into its receptacle."

enter the judgment to which the State has shown itself to be entitled. See and compare *Ex parte Werblud*, 536 S.W.2d 542, 544–545 (Tex.1979).

For the reasons herein assigned, the judgment of the trial court is reversed and the cause is remanded to the trial court with instructions to enter final judgment granting to the State all of the relief it sought in its trial pleadings. *Tex.Rev.Civ.Stat.Ann. art. 911b, Sec. 16(b) and (c)*.

Reversed and Remanded with instructions.