H.D. SCHWARZ, Jr., et al., Petitioners,

v.

The STATE of Texas, Respondent.

No. C–2592.

Supreme Court of Texas.

Jan. 15, 1986.

Rehearing Denied Feb. 19, 1986.

Fitzhugh H. Pannill, Jr., Kathy Butler, Hastings Pannill, Austin & Arnett, Fred A. Lange, Houston, for petitioners.

Jim Mattox, Atty. Gen., J. Milton Richardson and Ben F. McDonald, Jr., Asst. Attys. Gen., Austin, for respondent.

Garry Mauro, Com'r of the Gen. Land Office, Bob Armstrong, Ralph W. Yarborough, Austin, for General Land Office of Texas.

ON MOTION FOR REHEARING

WALLACE, Justice.

We grant the motion for rehearing, withdraw the opinion and judgment of June 12, 1985, and substitute this opinion.

This is a case to determine the title to coal and lignite under two tracts of land, formerly owned by the State of Texas, which total approximately 817 acres. In 1979, Schwarz filed a declaratory judgment action against the State of Texas and asserted title to the coal and lignite. Both parties filed motions for summary judgment. The trial court granted the State's motion for summary judgment; denied the motion filed by Schwarz; and held that the State owned all of the coal and lignite located under the land. The court of appeals affirmed the judgment of the trial court. 658 S.W.2d 822. We affirm the judgment of the court of appeals.

In 1907, the Alexanders, predecessors in interest to Schwarz, filed two applications

to purchase home tracts with the General Land Office. The lands which were the subject of the applications were classified as "mineral and watered agriculture." The applications stated:

I hereby apply to purchase under the provisions of Chapter 47, Act of 1895, and Chapter 129, Act of May 19, 1897, and the Acts approved April 19, 1901, April 15, 1905, and May 16, 1907, the following land....

The land was purchased pursuant to the Land Sales Act of 1895, ch. 47, 1895 TEX. GEN.LAWS 63, 10 H. GAMMEL, LAWS OF TEXAS 793 (1898), and the subsequent amendments in 1897, 1901, 1905, and 1907. *See* Act of May 19, 1897, ch. 129, 1897 TEX.GEN.LAWS 184, 10 H. GAMMEL, LAWS OF TEXAS 1239 (1898); Act of April 19, 1901, ch. 125, 1901 TEX.GEN. LAWS 292; Act of April 15, 1905, ch. 103, 1905 TEX.GEN.LAWS 159; Act of May 16, 1907, ch. 20, 1907 TEX.GEN.LAWS 490. Section 2 of the 1907 Act amended the Act of 1905 by adding section 6f:

The land which is now or may hereafter be classified as mineral may be sold for agricultural or grazing purposes, but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs and such reservations shall be stated in all applications to purchase....

Act of May 16, 1907, ch. 20, § 2, 1907 TEX.GEN.LAWS 490, 495. The applications provide that "[t]he minerals therein shall be and are reserved to the fund to which the land belongs...." In 1947, the State issued letters patent to the Alexanders. The patents recited that "[A]ll of the minerals in the above described land are reserved to the State."

On November 1, 1978, Schwarz executed a mining lease under which Farrell Construction Company was given the right to extract coal and lignite under the tract by open pit, underground mining, strip mining or auger mining methods. Schwarz executed the lease individually, and as an agent for the State, in accordance with then existing law. Act of March 15, 1967, ch. 16, 1967 TEX.GEN.LAWS 35, *repealed by* Act of September 1, 1977, ch. 871, art. I, § 2, 1977 TEX.GEN.LAWS 2345, 2689. *See* TEX.NAT.RES.CODE ANN. §§ 53.-061–53.073 (Vernon 1978). The lease contained the following clause: "It is agreed and understood that by executing this instrument, Owners waive no right, claim of interest or cause of action which accrue to them by reason of their ownership of the surface estate of the hereinabove described lands." The coal under the tract has been strip mined. Schwarz sought a declaratory judgment as to ownership of the coal pursuant to the Uniform Declaratory Judgments Act, TEX.REV.CIV.STAT.ANN. art. 2524–1 (Vernon 1965). Schwarz' claim to the minerals is grounded on this court's opinion in *Reed v. Wylie*, 597 S.W.2d 743 (Tex.1980). The State argues that coal and lignite were reserved when the Alexanders purchased the land in 1907.

In *Acker v. Guinn*, 464 S.W.2d 348 (Tex. 1971); *Reed v. Wylie*, 554 S.W.2d 169 (Tex. 1977); *Reed v. Wylie*, 597 S.W.2d 743 (Tex. 1980); *Moser v. U.S. Steel Corp.*, 676 S.W.2d 99 (Tex.1984) and *Friedman v. Texaco, Inc.*, 691 S.W.2d 586 (Tex.1985), this court considered those substances which are transferred between private parties in a general conveyance or reservation of "other minerals." In *Acker*, we held that a deed did not convey an interest in iron ore when the mining of it would consume or deplete the surface estate. We adopted a general intent test and held that "it is not ordinarily contemplated ... that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired" merely by conveyance or reservation of "minerals" or "mineral rights." 464 S.W.2d at 352. We applied the same rule to coal and lignite in *Reed v. Wylie*, 597 S.W.2d 743 (Tex.1980). In *Moser v. U.S. Steel Corp.*, we stated that certain substances, including near surface iron ore, coal, and lignite, belong to the surface estate as a matter of law. While we continue to adhere to these prior decisions, they are distinguishable here.

Unlike those cases, in this cause, the conveyance is *not* between private parties. The conveyance is between the State of Texas and a private party. In construing a grant of land from the State of Texas we must ascertain the intent of the legislature. *State v. Standard*, 414 S.W.2d 148 (Tex. 1967); *Dolan v. Walker*, 121 Tex. 361, 49 S.W.2d 695 (1932); *Empire Gas & Fuel Co. v. State*, 121 Tex. 138, 47 S.W.2d 265 (1932). If the legislature intended to convey the surface estate and retain minerals, the mining of which would destroy the surface, then we must give effect to that intention. We hold that the legislature did so intend.

■ The rule of presumed intent developed in *Acker, Reed I,* and *Reed II,* is merely a device for construing ambiguous conveyances. We held that when it is not clear exactly what the term "minerals" encompasses, we would presume that the parties intended the conveyance of only those substances which would allow them the full enjoyment of their respective estates. If there is an express conveyance of a specific substance, or some other controlling rule of construction indicating a different intent, we are not bound to follow the *Acker* and *Reed* presumption.

In the instant case there exists precisely such a controlling rule of construction. In *Empire Gas & Fuel Co. v. State*, 121 Tex. 138, 47 S.W.2d 265, 272 (1932), we expressly held:

> The rule is also well settled that legislative grants of property, rights, or privileges must be construed strictly in favor of the State on grounds of public policy, and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the State.

The statutory grant of authority to convey required the reservation of "the minerals." The ambiguous term "the minerals" must be interpreted in favor of the State.

This holding has been expressly quoted and followed in *State v. Standard*, 414 S.W.2d 148 (Tex.1967); *Magnolia Petrole-um Co. v. Walker*, 125 Tex. 430, 83 S.W.2d 929, 934 (1935); and *Dolan v. Walker*, 121 Tex. 361, 49 S.W.2d 695, 698 (1932). *See also Northern Pacific R. Co. v. Soderberg*, 188 U.S. 526, 534, 23 S.Ct. 365, 368, 47 L.Ed. 575 (1903); *Coosaw Mining Co. v. State of North Carolina*, 144 U.S. 550, 562, 12 S.Ct. 689, 691, 36 L.Ed. 537 (1892); and, *Central Transportation Co. v. Pullmans Palace-Car Co.*, 139 U.S. 24, 49, 11 S.Ct. 478, 484, 35 L.Ed. 55 (1890).

In *Magnolia Petroleum Co. v. Walker*, 83 S.W.2d at 934, after reciting the above quote from *Empire Gas & Fuel Co.*, we stated:

> When we recall the extent of the vast public domain originally owned and held by the State for the benefit of the public, the great bodies of public lands that have been appropriated and dedicated to the public free school fund, to counties, to asylums, and to the State University and its branches, also, when we recall that within the last few years valuable minerals have been discovered underlying this land, and the task imposed upon the legislature to safeguard by the enactment of proper legislation the rights of all concerned with respect thereto, the wisdom of the foregoing rule is clearly manifest.

■ We hold that the proper interpretation of the conveyance between the Alexanders and the State of Texas is that the State of Texas meant to withhold from conveyance all of the coal or lignite located on or under the surface of the land granted, whether or not recovery of such would destroy or deplete the surface estate.

Besides the above recited rule of construction, there is other, more empirical, evidence that such was the legislature's intent. The Republic of Texas utilized the general laws of Mexico until 1840, when the common law was adopted. Hart Dig. art. 127. The act adopting the common law repealed "certain Mexican laws," however, it expressly excepted from its application "such laws as relate to the reservation of islands, and also of salt lakes, licks and salt

springs, mines and minerals of every description." The applicable Mexican law stemmed from the Las Siete Partidas (the law of Spain), enacted long before either the Mexican or the Texan Revolution. According to the Partidas, Spanish land grants were of the surface only. The Partidas stated that the King had the ownership:

Of all mines ... and even if in the patent conferring the grant it was not stated that the King reserved the aforesaid prerogatives for himself, he to whom the grant was made should not, for all that, understand that he acquired any right to the same.

Partida II, Title XV, Law V, Samuel P. Scott, Las Siete Partidas (1931).

In *Cowan v. Hardeman*, 26 Tex. 217 (1862), this court held that an 1855 State Land Patent which was silent as to the granting or reserving of minerals did not grant a dry salt lake which was situated upon the land. The court stated:

In so far as concerns the use [of the surface estate], it may, however, be avoided in part or in whole by the exercise of [the State's] reserved right in the salt spring or minerals embraced within it. The State must have the easement of going upon the land for this purpose; and if to the full enjoyment of the right of the State; it should become necessary to use the whole of the land, timber and water upon the tract, the right of the State to an easement to that extent cannot, I apprehend, be questioned.

This was a harsh statement, but was nevertheless the law. The drafters of the Texas Constitution of 1866 recognized it as such and included a provision releasing "to the owner of the soil all mines and mineral substances, that may be on the same." TEX.CONST. art. VII, § 39 (1866). The Constitutions of 1869 (art. X, § 9) and 1876 (art. XIV, § 7) also contained this provision, thus indicating a recognition that all general land grants reserved all minerals unless otherwise released. In 1879, the legislature passed a Mineral Release Act which contained substantially the same language

as the constitutional provisions. TEX.CIV. STAT. art. 3800 (1879).

In the Land Sales Act of 1883, Section 14 provided:

The minerals on all lands sold or leased under this Act are reserved by the State for the use of the fund to which the land now belongs.

1883 TEX.GEN.LAWS 88, 9 H. GAMMEL 391. At the same time the legislature passed the Mining Act of 1883 which provided a method for prospecting and staking a claim on State lands. The Mining Act specifically mentioned coal. 1883 TEX. GEN.LAWS 97, § 3, 9 GAMMEL 406.

Various land and mining acts, and revisions thereof, were passed between 1883 and 1895. In 1895, the legislature passed the Land Sales Act of 1895, 1895 TEX. GEN.LAWS 47, 10 GAMMEL 793 and the Mining Act of 1895, 1895 TEX.GEN.LAWS 127, 10 GAMMEL 927. The legislature also passed the Mineral Release Act of 1895, TEX.CIV.STAT. 4041 (1895). This Act released the minerals to the owners of the surface for all persons who received land grants during the period 1879 to 1895. *Cox v. Robison*, 105 Tex. 426, 150 S.W. 1149, 1156 (1912).

The opinion in *Cox* also contains a lengthy discussion on the effect of the various constitutional and statutory release clauses. The court noted that a dry salt lake in Hidalgo County, El Sal del Rey, was clearly recognized by the legislature as belonging to the State, so much so that in 1862 the Governor was directed to send troops to guard it. It is difficult to rationalize how a dry salt lake on the surface of a grant is part of the reserved mineral estate and a deposit of lignite 50 feet below the surface is not.

In any case, the 1895 Acts established a specific procedure for granting lands from the public domain. The Mining Act directed the Commissioner of the General Land Office to have a map made showing the location of all public school, university, asylum, and public lands yet unsold. The lands so mapped were to be surveyed by a team of geologists, and those that were

apparently mineral bearing were to be designated "as mineral lands for the purpose of this Act." Ch. 47, 1895 TEX.GEN. LAWS 63. The "mineral" lands so designated were "reserved from sale or other disposition" and opened to exploration in accordance with the Act.

Section 3 of the Land Sales Act of 1895 directed the Commissioner of the General Land Office to "carefully and skillfully" classify the lands, and to classify the lands into agricultural, pasture, and timber lands. These lands were to be sold to settlers.

Section 10 of the Mining Act stated that:

... any person ... shall have the right to purchase or obtain patent by compliance with this Act or [sic] any of the lands of the State which are specified or included in section 1 of this Act containing valuable deposits of ... coal ... and all said lands are reserved from sale or other disposition than under this Act; and where application is made to buy any of the lands herein named except under this Act, the purchaser shall swear that there are none of the minerals named in this Act on said lands, so far as he knows or has reason to believe or does believe.

From 1895 until 1907 these mineral classified lands were not open to settlement, merely to prospecting. Vast areas of West Texas were reserved from sale to those who desired to draw their living from the use of the surface resources because the land was known or suspected to contain valuable minerals from which the State desired to derive income. In recognition of this dilemma the 1907 legislature passed another Land Sales Act, as quoted above, § 6f of which stated:

The land which is now or may hereafter be classed as mineral, may be sold for agricultural or grazing purposes, but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs and such reservation shall be stated in all applications to purchase....

As noted above, the applications here were classified as "mineral and watered agri-cultural" and the applications contained an express reservation of "all of the minerals in the above described land."

Thus, after tracing the history of mineral reservations in public land grants, it is clear that the sovereign in Texas has always claimed all of the substances commonly classified as "minerals" and only gives away those substances by an express release or conveyance. Even disregarding the historical basis, however, there remains a very valid reason for the distinction between conveyances by private parties and conveyances by the State. The State holds the public lands in trust for the benefit of all of her people. The State subsidized and encouraged settlement in frontier areas by offering the land to settlers on extremely favorable terms. The Alexanders did not purchase this land in the open market place and they did not pay the full market price for it. Furthermore, the legislature has provided by statute that money paid for certain minerals reserved by the State, the extraction of which is usually destructive to the surface, such as coal, lignite, and uranium, will be divided with the surface owner. TEX.NAT.RES.CODE ANN. § 53.-065 (Vernon 1978) provides that the surface owner will receive 40% of all bonuses, rentals and royalties. Section 53.066 provides that these payments are in place of all damage to the soil. Section 53.061 allows the surface owner to negotiate the lease. Chapter 131 of the Code mandates reclamation of the surface by a strip mine operator. These statutory protections were not purchased in the open market place but rather are part of the same broad public policy which reserved to the State the lignite under the Schwarz' property.

For the above reasons we hold that all of the lignite located on or under the Schwarz tract belongs to the State of Texas.

The judgment of the court of appeals is affirmed.

RAY, J., concurs.

RAY, Justice, concurring.

The quagmire deepens. The ill-begotten journey begun by the court fourteen years

ago in *Acker v. Guinn*, 464 S.W.2d 348 (Tex.1971) has now come nearly full circle. Its wake is a trail of irreconcilable cases. I concur because I agree with the result reached by the majority but disagree with the reasoning.

Texas case law on the meaning of the word "mineral" in instruments conveying or reserving "oil, gas and other minerals" consists of a strand of incompatible decisions. Today's opinion neither reconciles the cases nor helps to rectify the mistakes of the past.

The problems began in *Acker v. Guinn*, supra, with the simple question of the meaning of the word "mineral" in an "oil, gas and other mineral" reservation. For decades the term mineral was governed by the ordinary and natural meaning of the word. See, *Heinatz v. Allen*, 147 Tex. 512, 217 S.W.2d 994 (1949) and *Cain v. Neumann*, 316 S.W.2d 915 (Tex.Civ.App.—San Antonio 1958, no writ). Then, the *Acker* court held that "[u]nless a contrary intention is affirmatively and fairly expressed, ... a grant or reservation of 'minerals' or 'mineral rights' should not be construed to include a substance that must be removed by methods that will ... consume or deplete the surface estate." *Acker*, at 352. Because of that opinion, it became impossible to look at a conveying instrument and determine which substances of the earth an "oil, gas and other mineral" transaction conveyed; it was no longer possible to rely on a title examiner's opinion as to ownership of minerals. Thus, estate owners had to litigate ownership.

Six years later the court handed down *Reed v. Wylie*, 554 S.W.2d 169 (Tex.1977) soon followed by *Reed v. Wylie*, 597 S.W.2d 743 (Tex.1980). In a noble attempt to do equity to the surface estate owner, the court developed the near surface destruction test which made ownership of minerals a fact question. However, instead of simplifying the problems created by *Acker*, the *Reed* court compounded them. In an unspecific grant or reservation of minerals, all deposits found within 200 feet of the surface are owned by the surface estate

owner as a matter of law. This rule, the court has insisted, effects the intent of the parties. *Moser v. U.S. Steel*, 676 S.W.2d 99, 101 (Tex.1984).

The court next addressed the issue in *Moser v. U.S. Steel*, supra. Citing *Heinatz v. Allen* and *Cain v. Neumann*, the *Moser* court correctly abandoned the *Acker* and *Reed* approach for an "ordinary and natural meaning of the word" approach coupled with a rule to compensate the surface owner for surface destruction. As I noted in my dissent in *Moser*, I agree with this approach, but disagree with the prospective limitation imposed on the compensation rule. The *Moser* rule does not consider the intent of the parties in pre-June 8, 1983 severances and leaves those estate owners in the same quandry of title uncertainty which *Moser* purported to resolve. This was exemplified in the recent decision of *Friedman v. Texaco*, 691 S.W.2d 586 (Tex. 1985). In my dissent in *Friedman*, I warned of the complexity of our problem. The Friedman severance took place in 1959 when the definition of the word mineral was governed by *Heinatz v. Allen* and *Cain v. Neumann*, supra, the very cases cited by the *Moser* court in announcing the "ordinary and natural meaning of the word" test. These are the cases that should have controlled that decision. However, because the Friedman severance took place before June 8, 1983 the majority employed the *Acker* and *Reed* 200 foot surface destruction test to deny the Friedmans the ownership of their uranium.

The case before us today involves a pre-June 8, 1983 severance. Although this court in *Friedman* reaffirmed the application of the near surface destruction test in such severances, the majority does not apply that test to the minerals in the present case. The *Friedman* opinion, the opposite result, is never fully distinguished. Instead, the majority stretches back to Las Siete Partidas, jumps in and out of century old Land Sales and Mining Acts, and makes tenuous distinctions between transactions among private parties and those involving the State. By the end of it all, the majori-

ty's law gropes in this quagmirish fog: the surface belongs to the surface estate owner and the minerals belong to the mineral estate owner, except in pre-June 8, 1983 severances where nobody knows who owns what (not even a title examiner) until ownership has been litigated, in which case if some portion of a mineral is found within 200 feet of the surface, it belongs to the surface owner unless, of course, the land was purchased pursuant to the Land Sales Act of 1895, in which case even though the estates were severed before June 8, 1983, the minerals belong to the mineral estate, or the State.

The contortions the majority has gone through to reach its decision today could and should have been avoided. To reach the equitable result it strives for, the majority should state the law as found in *Cain* and *Heinatz:* the meaning of an "oil, gas and other (any) mineral" conveyance or reservation should be controlled by the ordinary and natural meaning of those words.