COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| THE STATE OF TEXAS, | § | No. 08-10-00082-CV |
| | | |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | County Court at Law Number Five |
| CEMEX CONSTRUCTION | § | |
| MATERIALS SOUTH, L.L.C., | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC# 2009-2821) |
| | § | |

**O P I N I O N**

Appellant, the State of Texas (the State), brought suit against Appellee, Cemex Construction Materials South, L.L.C. (Cemex), for conversion, breach of contract, and trespass to try title seeking preliminary and permanent injunctive relief, confirmation of its title to the "valuable building materials" reserved to the State in its conveyances to the original purchasers of four parcels of public school lands described hereafter, $558,000,000 in actual damages, and other relief.[1] The State filed a motion for partial summary judgment, Cemex filed its motion for summary judgment, and both parties submitted respective replies and responses thereto. The trial court denied the State's motion for partial summary judgment and granted Cemex's summary-judgment motion. In two issues, the State contends the trial court erred on both summary-judgment rulings. We agree, and we reverse the trial court's judgments below, render judgment granting the State's motion for partial summary judgment, and remand the case for further proceedings.

---

[1] Cemex filed a counterclaim against the State and a third-party claim against the General Land Commissioner, Jerry Patterson. After the trial court entered its summary judgment orders on December 17, 2009, the State and Jerry Patterson moved for summary judgment on Cemex's counterclaims and third-party claims, which are not the subject of this appeal.

**BACKGROUND**

*The State's Motion for Partial Summary Judgment*

The four public-school land parcels at issue, to which we collectively refer hereafter as "the McKelligon Canyon lands," are located in El Paso County and include Section 22, Township 2, Block 81 of the Texas and Pacific Railway Co. Survey (Section 22), Eli Nations Survey No. 271 (Nations Survey), Lee Moor Survey No. 221 (Moor Survey 221), and Lee Moor Survey 222 (Moor Survey 222). In its motion for partial summary judgment, the State alleged that the 1895 Land Sales Act and Title LXXI of the Mining Act of 1895, as amended, reserved to the State title to all minerals located in and on public school lands, here the McKelligon Canyon lands, when they were originally sold by the State to Cemex's predecessors in interest in 1900, 1906, and 1912. Act of Apr. 4, 1895, 24th Leg., R.S., ch. 47, § 1, 1895 Tex. Gen. Laws 63; Act of April 30, 1895, 24th Leg., R.S., ch. 127, §§ 1, 10, 14, 1895 Tex. Gen. Laws 197, *repealed by* Act of April 9, 1913, 33rd Leg., R.S., ch. 173, 1913 Tex. Gen. Laws 409. The proceeds which the State is to receive from its ownership and royalty interests in sold and unsold pubic school lands are constitutionally dedicated to the benefit of the Permanent School Fund, which is maintained for the benefit of public school children in the State of Texas.[2] Consequently, the State's motion for partial summary judgment asserted that, as a matter of law, the State owns all deposits of granite, limestone, gravel, sand, and any other mineral substances of whatever kind or character having economic or commercial value located on or within the McKelligon Canyon lands. The State therefore asked the trial court to: (1) confirm the State's reservation of mineral deposits for the benefit of the Permanent School Fund at the time the State sold the McKelligon Canyon lands to private citizens in 1900, 1906, and 1912, and (2) hold "that

---

[2] *See Schendell v. Rogan*, 94 Tex. 585, 591, 592, 63 S.W. 1001, 1002-3 (1901) ("The constitution and laws of the state of Texas have divided the public domain into free-school lands, asylum lands, and university lands; each class being dedicated to a special purpose; all other lands being designated public lands.").

all deposits of mineral substances of whatever kind or character having commercial value located on the McKelligon Canyon Lands are part of the minerals reserved to the State."

*Cemex's Motion for Summary Judgment*

As grounds for its motion for summary judgment, Cemex asserted that: (1) dirt, caliche, sand, gravel, limestone, and other materials at issue are not "minerals" reserved to the State and therefore belong to Cemex; (2) it did not convert anything belonging to the State because Cemex was granted consent "to do what it has done," and the State is not entitled to relief; (3) it did not breach a contract with the State as a matter of law; and (4) any pre-2005 royalties are not recoverable because, as the State's representative noted in a pre-trial discovery affidavit addressing a request for records, information prior to 2005, the year Cemex purchased the McKelligon Canyon lands, "is not relevant to this lawsuit[.]"

After hearing the motions, the trial court denied the State's motion for partial summary judgment, granted Cemex's motion for summary judgment, denied the State's motion for reconsideration, severed the summary judgment rulings to permit appeal thereof, and abated all other claims.

## DISCUSSION

*Issues*

In Issue One, the State asserts the trial court erred in denying its motion for partial summary judgment because, as a matter of law and as intended by the Legislature, Title LXXI of the 1895 Mining Act statutorily reserved to the State title to valuable deposits of limestone, granite, and other valuable building materials from the original sales of the McKelligon Canyon lands. In Issue Two, the State contends the trial court erred in granting Cemex's motion for summary judgment because: (1) Cemex's ownership claim is flawed as it improperly relied upon Attorney General opinions

interpreting statutes inapplicable to these properties, ignores the reservation of minerals and materials to the State as expressed in Title LXXI of the 1895 Mining Act, and ignores the differences between land sales occurring solely between private parties and those occurring between the State and a private party; (2) a State employee is not authorized to consent to the taking of State property; (3) the State is entitled to conversion damages; (4) the State has a viable conversion claim; (5) Cemex does not own the minerals and building materials at issue and therefore, summary judgment against the State for breach of contract is precluded; and (6) Cemex misunderstands a General Land Office (GLO) employee's affidavit which commented on the relevancy of pre-2005 GLO annual reports and failed to create a basis for summary judgment in favor of Cemex on any issue.

*Standard of Review*

**Summary Judgments**

We review a trial court's ruling on a motion for summary judgment *de novo*. *Mid-Century Ins. Co. of Texas v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007). When both parties move for summary judgment and the trial court grants one and denies the other, a non-prevailing party may appeal both on the judgment granted against it and on its motion that was denied. *Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex. 1996). Under such circumstances, we resolve all questions presented and render the judgment the trial court should have rendered. *Mid-Century*, 243 S.W.3d at 621, *quoting Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 529 (Tex. 2002); *Valence Oper. Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The question to be determined on appeal is whether the movant established that there is no genuine issue of material fact, thereby entitling the movant to a judgment as a matter of law. *Nixon v. Mr. Property Mgmt.*, 690 S.W.2d 546, 548 (Tex. 1985).

We may review and affirm a summary judgment on any ground the movant presented to the trial court in its motion, regardless of whether the trial court identified the ground upon which it

relied in granting the summary judgment. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). When the trial court does not identify the ground or grounds upon which it grants a summary judgment, the nonmovant must show that each ground alleged in the motion is insufficient to support the judgment. *Jones v. Hyman*, 107 S.W.3d 830, 832 (Tex. App. – Dallas 2003, no pet.). A summary judgment may be affirmed on any meritorious ground alleged. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

When a summary judgment is erroneously granted, we review the ruling on the opposing motion and grant summary judgment based on that motion if the trial court should have granted it. *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 648 (Tex. 2004). We do not reverse and render for the other party unless that party is entitled to a final - and not a partial- summary judgment as a matter of law. *CU Lloyd's v. Feldman*, 977 S.W.2d 568, 569 (Tex. 1998).

**Texas Land Grants**

When construing a grant of land from the State of Texas, we are required to ascertain the intent of the Legislature. *Schwarz v. State*, 703 S.W.2d 187, 189 (Tex. 1986), *citing State v. Standard*, 414 S.W.2d 148 (Tex. 1967); *Dolan v. Walker*, 121 Tex. 361, 49 S.W.2d 695 (1932); *Empire Gas & Fuel Co. v. State*, 121 Tex. 138, 47 S.W.2d 265 (1932). In construing a statute, it is our objective to give effect to the Legislature's intent. TEX. GOV'T CODE ANN. § 312.005 (West 2005); *Mid-Century*, 243 S.W.3d at 621, *citing Am. Home Prods. Corp. v. Clark*, 38 S.W.3d 92, 95 (Tex. 2000). We commence our interpretation of statutes by considering their plain meaning, which we derive by considering the entirety of the act rather than isolated portions thereof. *Mid-Century*, 243 S.W.3d at 621. We interpret a statute to give effect to every part. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002); *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998). If the Legislature intended to convey the surface estate and retain minerals, then we must give effect to that intention.

*Schwarz*, 703 S.W.2d at 189. Where there is an express conveyance of a specific substance, or some other controlling rule of construction indicating a different intent, we are not bound to follow the rule of presumed intent, which is merely a device for construing ambiguous conveyances. *Id.* When construing a conveyance between the State and a private party, the Texas Supreme Court has expressly held:

> The rule is also well settled that legislative grants of property, rights, or privileges must be construed strictly in favor of the State on grounds of public policy, and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the State.

*Empire Gas & Fuel Co. v. State*, 121 Tex. 138, 47 S.W.2d 265, 272 (1932). A court should construe a statute with reference to its manifest object and give effect to its purpose. *Citizens Bank of Bryan v. First State Bank, Hearne*, 580 S.W.2d 344, 348 (Tex. 1979). The meaning of words used in a statute must be gauged in light of the history of the times out of which the statute arose. *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138, 1150 (1939); *see Big Lake Oil Co. v. Reagan County*, 217 S.W.2d 171, 173 (Tex. Civ. App. – El Paso 1948, writ ref'd) (it is the meaning of the terms at the time the statute is enacted that is sought and governs). Where a statutory grant of authority to convey requires the reservation of "the minerals," that term must be interpreted in favor of the State. *Schwarz*, 703 S.W.2d at 189.

### *Applicable Law*

As described more fully below, the McKelligon Canyon lands are public-school fund lands. The sale of public school land is governed by the law in effect at the time of the sale. *See Camp v. Smith*, 166 S.W. 22, 23 (Tex. Civ. App. – El Paso 1914, writ ref'd); *State v. Houston Oil Co. of Tex.*, 194 S.W. 422, 434 (Tex. Civ. App. – Austin 1917, writ ref'd). Because the McKelligon Canyon public-school lands were sold by the State to private purchasers in 1900, 1906, and 1912, the grants

and reservations thereto are governed by the Texas Constitution, the Land Sales Acts, and the Mining Acts, in existence and as amended at the time of the conveyances.

When the State sold the McKelligon Canyon lands in 1900, 1906, and 1912, the Texas Constitution of 1876 provided, as it essentially does today, that:

> Sec. 1.  A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.
> Sec. 2.  All funds, lands and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads, or other corporations, of any nature whatsoever; one-half of the public domain of the State,  and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual public school fund.

TEX. CONST. of 1876, art. VII, §§ 1 and 2.

Before September 1, 1895, all rights of the State of Texas to the minerals in lands were released to surface owners except in those cases subsequent to 1876 where the minerals were expressly reserved by the State.  TEX. CONST. of 1876, art. XIV, § 7; *see also* TEX. CONST. of 1866, art. 7, § 39; TEX. CONST. of 1869, art. 9, § 9.  In *Cox v. Robison*, the Texas Supreme Court determined that the Texas Constitution's mineral releases to surface owners were retrospective, affecting only previous conveyances by the State, and did not bar the Legislature from reserving minerals to the State in future grants of public school and other lands.[3]  *Cox v. Robison*, 105 Tex.

---

[3]  In *Cox v. Robison*, the Texas Supreme Court considered a suit for mandamus whereby Cox, who had applied in 1907 to purchase land classified as grazing with mineral deposits under Title LXXXVII, Chapter Twelve A, Revised Statutes of 1895 and had executed and filed an affidavit that to the best of his knowledge and belief there were no minerals embraced in Title LXXI on the land and therein waived all rights thereto, sought to compel GLO Commissioner Robison to issue an unconditional patent, that is, one without any reservation of the minerals to the State, for a section of public free school land under article 3498a of the Revised Statutes of 1895.  *Cox v. Robison*, 105 Tex. 426, 428, 150 S.W. 1149, 1150 (1912).  Cox contended that upon adopting Section 7, article 14 of the Constitution, the State lost its power to enact laws, such as article 3498a, providing for the reservation of minerals in the conveyance of public-school and other lands.  *Cox*, 150 S.W. at 1150.  Section 7, article 14 of the 1876 Constitution provided that "The state of Texas hereby releases to the owner or owners of the soil all mines and minerals that may be on the same, subject to taxation as other property."  TEX. CONST. art. XIV, § 7 (1876).  Recognizing "that the decision as to where, under the Constitution, the title to these minerals rests is of such

426, 428, 150 S.W. 1149, 1150 (1912).

When it enacted the Land Sales Act of 1895, the Legislature provided that "all lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools . . . shall be sold and leased under the provisions of this act." Act of Apr. 4, 1895, 24th Leg., R.S., ch. 47, § 1, 1895 Tex. Gen. Laws 63. The sale of such land was deemed and held effective from the date the affidavit and obligation were filed in the General Land Office. *See* Act of Apr. 4, 1895, 24th Leg., R.S., ch. 47, § 9, 1895 Tex. Gen. Laws 63; Act of Apr. 15, 1905, 29th Leg., R.S., ch. 103, § 4, 1905 Tex. Gen. Laws 159, 161.

During the same legislative session, the Legislature enacted the Mining Act of 1895 which applied to the sales of public school land occurring between 1895 and 1913. Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 1, 1895 Tex. Gen. Laws 197 (repealed 1913). In Section 1 of the Mining Act of 1895, the Legislature specified that "All public school, university, asylum and public lands specially included under the operation of this act . . . [and other specified lands] containing valuable mineral deposits, are hereby reserved from sale or other disposition, except as herein provided, and are declared free and open to exploration and purchase under regulations prescribed by law. . . ." *Id*. The Commissioner of the General Land Office (GLO) was required to map all unsold public school land and the Geological and Mineralogical Survey was required to examine all such lands and designate those tracts that were apparently mineral-bearing as "mineral lands." Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 2, 1895 Tex. Gen. Laws 197 (repealed 1913). A person or

consequence as to challenge the most serious consideration and constrain the court to a solicitous care for the accuracy of its conclusions," the Court concluded "that it was not the intention of the framers of the original provision in [the 1866 Constitution], or of the people who adopted the present Constitution in 1876, to give [Section 7] a prospective operation and effect, so as to deny to the Legislature the power to provide for the reservation of minerals in future grants of the school and other public lands if, in their wisdom and the exercise of their province, such reservation was in accord with a sound public policy and best interests of the state." *Cox*, 150 S.W. at 1151, 1156. Therefore, the Constitution did not bar the State from reserving such interests in future grants of school lands.

association of persons in compliance with certain provisions could purchase and obtain patent to any

of the specified State lands containing:

> [V]aluable deposits of *kaolin, baryta, salt, marble, fire clay, iron ore, coal, oil, natural gas, gypsum, nitrates, mineral paints, asbestos, marl, natural cement, clay, onyx, mica, precious stones or any other non-metallic mineral and stones valuable for ornamental or building purposes or other valuable building material*, in legal subdivisions in quantity not exceeding one section:  Provided that where any such parties shall have heretofore expended, or shall hereafter expend, five thousand dollars in developing *the aforesaid mineral resources* of any of said lands, such party shall have the right to buy one additional section and no more, and to include in the purchase any section or part thereof on which the work may have been done. . . .; [A]nd all said lands are reserved from sale or other disposition than under this act; and where application is made to buy any of the lands herein named except under this act, the purchaser shall swear that there are none *of the minerals named in this act* on said lands, so far as he knows or has reason to believe or does believe:  Provided, further, that any party hereinbefore named, who shall prior to the passage of this act, have been the first to work on said lands for the development of *said mineral resources*, . . . shall have a prior preference right of doing so for thirty days after this act goes into effect:  Provided, further, this section of this act shall not authorize the sale of lands containing valuable deposits of gold, silver, lead, cinnabar, copper or other valuable metal. . . .

Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 10, 1895 Tex. Gen. Laws 197 (repealed 1913).

(Emphasis added).  Section 14 of the act also provided that:

> Whenever any application shall be made to buy or obtain title to any of the lands embraced in section 1 of this act, except where the application is made under this act, the applicant shall make oath that there is not, to the best of his knowledge and belief, any of *the mineral embraced in this act* thereon, and when the commissioner has any doubt in relation to the matter he shall forbear action until he is satisfied.  And such sale or disposition of said lands shall be understood to be, with the reservation of the minerals thereon . . . .

Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 14, 1895 Tex. Gen. Laws 197 (repealed 1913).

(Emphasis added).  The net proceeds of all sales of mining lands inured to the benefit of the State

and the respective land funds set apart under the Constitution and laws of the State.  Act of April 30,

1895, 24th Leg., R.S., ch. 127, § 19, 1895 Tex. Gen. Laws 197 (repealed 1913).  Proclaiming the

mining interests of the State to be great and important, and noting that "there are no general laws free

from doubt and uncertainty regulating in an adequate, general and just manner the mining interest of the whole State," the Legislature declared that an imperative public necessity and emergency existed for the passage of the Act, and suspended the constitutional rule requiring bills to be read on three consecutive days, thereby providing that the Act "take effect and be in force from and after its passage." Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 21, 1895 Tex. Gen. Laws 197 (repealed 1913). Thus, the State of Texas owns all mineral interests underlying public school fund lands. *See Tynes v. Mauro,* 860 S.W.2d 168, 170 (Tex. App. – El Paso 1993, pet. denied).

*Schwarz v. State*

Our analysis of the parties' summary judgment motions and the application of the recited Constitutional and statutory provisions thereto is guided by the Texas Supreme Court's analysis in *Schwarz v. State*, 703 S.W.2d 187 (Tex. 1986). There, in construing a grant of "mineral and watered agriculture" lands from the State to a private party in 1907, the Texas Supreme Court determined that the Legislature intended to withhold from the conveyance all of the coal or lignite, the materials at issue in that case, whether or not recovery of such substances would destroy or deplete the surface estate. *Id.* at 188-89.

As here, the land at issue in *Schwarz* had been purchased pursuant to the Land Sales Act of 1895 and the subsequent amendments thereto in 1897, 1901, 1905, and 1907. *Schwarz*, 703 S.W.2d at 188 (citations omitted). The 1907 Act amended the 1905 Act and provided that "[t]he land which is now or may hereafter be classified as mineral may be sold for agricultural or grazing purposes, but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs and such reservations shall be stated in all applications to purchase . . . ." *Schwarz*, 703 S.W.2d at 188. The application for purchase of the land provided that the minerals were "reserved to the fund to which the land belongs . . . ." *Id.*

Forty years later, the State issued to the property owners letters patent which recited that "all of the minerals in the above described land are reserved to the State." *Id.* Thirty-one years thereafter, Schwarz executed a mining lease with the owners of the land to extract coal and lignite and he later sought a declaratory judgment claiming ownership of the coal. *Id.* at 189. Because the State, and not a private party, conveyed the land to the original applicants, the Texas Supreme Court looked to the relevant statutes in effect at the time of the conveyance and, recognizing that such legislative grants must be construed strictly in favor of the State on grounds of public policy, determined that the Legislature intended to convey the surface estate and retain the minerals. *Id.* The Court also recognized its previous holdings that whatever is not unequivocally granted in clear and explicit terms is withheld and any ambiguity or obscurity in the terms of the statute, such as the term "the minerals," must be interpreted in favor of the State. *Schwarz*, 703 S.W.2d at 189, *citing Empire Gas & Fuel. Co*, 47 S.W.2d at 272.

In rendering its decision in *Schwarz*, the Court considered more than one-hundred years of sovereign-conveyance law and practice in Texas, including the Republic of Texas' utilization of the general laws of Mexico, the roots of which arose from the Spanish Las Siete Partidas, under which Spanish land grants to the surface estate kept for the King ownership to "all mines." *Schwarz*, 703 S.W.2d at 189-90, *quoting* Partida II, Title XV, Law V, Samuel P. Scott, *Las Siete Partidas* (1931). The Court examined the 1866, 1869, and 1876 Texas Constitutions, the latter of which recognized that "all general land grants reserved all minerals unless otherwise released," a concept substantially embodied in the 1879 Mineral Release Act. *Schwarz*, 703 S.W.2d at 190, *citing* TEX. CONST. art. VII, § 39 (1866), TEX. CONST. art. X, § 9 (1869), TEX. CONST. art. XIV, § 7 (1876), TEX. CIV. STAT. art. 3800 (1879). The Legislature thereafter enacted both the Land Sales Act of 1883, which provided that "[t]he minerals on all lands sold or leased under this Act are reserved by the State for

the use of the fund to which the land now belongs," as well as the Mining Act of 1883, which established methods for the prospecting and staking of claims on State lands. *Schwarz*, 703 S.W.2d at 190, *citing* 1883 TEX. GEN. LAWS 88, 9 H. GAMMEL 391, 1883 TEX. GEN. LAWS 97, § 3, 9 GAMMEL 406.

Twelve years thereafter, the Legislature passed the Mineral Release Act of 1895, the Land Sales Act of 1895, and the Mining Act of 1895. By its enactment, the Mineral Release Act of 1895 released minerals to surface owners who had received State land grants from 1879 to 1895. *Schwarz*, 703 S.W.2d at 190, *citing* TEX. CIV. STAT. 4041 (1895), *Cox*, 150 S.W. at 1156 (holding that release of such minerals to surface owners was retrospective rather than prospective and that the Legislature was not constitutionally barred from reserving to the State minerals from future land grants).

The Mining Act of 1895, among other things, directed the General Land Office (GLO) Commissioner to map and survey all unsold public school, university, asylum, and public lands and designate those appearing to be mineral-bearing. *Schwarz*, 703 S.W.2d at 190-91, *citing* 1895 TEX. GEN. LAWS 127, 10 GAMMEL 927, Ch. 47, 1895 TEX. GEN. LAWS 63. The designated mineral-bearing lands were "reserved from sale or other disposition" but were opened to exploration. *Schwarz*, 703 S.W.2d at 190-91. Section 10 of the 1895 Mining Act expressly provided that public school land containing valuable deposits of coal and other items were reserved from sale or other disposition than under the Act and required potential buyers to file with their purchase applications an affidavit in which they were required to swear that none of the minerals named therein were on said lands "so far as he knows or has reason to believe or does believe." Act of April 30, 1895, 24th Leg., R.S., ch. 127, § 10, 1895 Tex. Gen. Laws 197 (repealed 1913); *Schwarz*, 703 S.W.2d at 190-91.

In the Land Sales Act of 1895, the Legislature directed the GLO Commissioner to classify agricultural lands, pasture lands, and timber lands for sale to settlers. *Schwarz*, 703 S.W.2d at 191, *citing* 1895 TEX. GEN. LAWS 47, 10 GAMMEL 793. As noted by the Court in *Schwarz*:

> From 1895 until 1907 these mineral classified lands were not open to settlement, merely to prospecting. Vast areas of West Texas were reserved from sale to those who desired to draw their living from the use of the surface resources because the land was known or suspected to contain valuable minerals from which the State desired to derive income. In recognition of this dilemma the 1907 legislature passed another Land Sales Act . . . which stated[,] "The land which is now or may hereafter be classed as mineral may be sold for agricultural or grazing purposes, but all sales of such land shall be upon the express condition that the minerals shall be and are reserved to the fund to which the land belongs and such reservation shall be stated in all applications to purchase. . . ."

*Schwarz*, 703 S.W.2d at 191. Because the State holds the lands in trust for the benefit of all her people, the Court recognized that a conveyance between the State and a private party is distinct from those occurring between private parties. *Id.* Having conducted this thorough analysis, the Court declared that "it is clear that the sovereign in Texas has always claimed all of the substances commonly classified as 'minerals' and only gives away those substances by an express release or conveyance." *Id.*

*Application*

I.

**1900 - Purchase of Section 22**

On September 22, 1900, C. M. Whitaker applied to purchase Section 22, a mineral-classified parcel of public school land, for dry-grazing under the Land Sales Act "as provided for in Title LXXXVII, Chapter Twelve A, of the Revised Civil Statutes of 1895, and the amendments thereto by the act of May 19, 1897[.]" *See* Act of Apr. 4, 1895, 24th Leg., R.S., ch. 47, §1, 1895 Tex. Gen. Laws 63; Act of May 19, 1897, 25th Leg., R.S., ch. 129, 1897 Tex. Gen. Laws 184. On October 18,

1900, Whitaker executed a hand-written affidavit in which he swore that none of the minerals named in the Mining Act of 1895 were on the land and that if any of the said minerals named in the mining laws of Texas should ever be found on said land, that he "does not now nor will he ever claim the same under or by virtue of his location, application, or purchase which he makes under and by virtue of 'Chapter Twelve A' Title LXXXVII, page 828[,] Revised Civil Statutes of the State of Texas." Neither the patent issued to Whitaker by Governor S.W.T. Lanham in 1904 nor the 1990 Warranty Deed for Section 22 expressly contains or identifies therein a reservation of mineral rights.[4]

In its motion for summary judgment, Cemex asserted that the reservation of minerals from Section 22 was required to be set forth in the patent issued by the State, rather than the purchaser's application and affidavit. We disagree. There can be no dispute that Section 22 involved a State grant of public school land to Cemex's predecessor in interest and that by Title LXXI of the Mining Act of 1895, also in effect at the time of Whitaker's purchase application and affidavit, the Legislature reserved title to all of the specifically and generally enumerated items therein from the grant of public school lands. *See* Act of April 4, 1895, 24th Leg., R.S., ch. 47, § 1, 1895 Tex. Gen. Laws 63; Act of April 30, 1895, 24th Leg., R.S., ch. 127, §§ 1, 10, 14, 1895 Tex. Gen. Laws 197 (repealed 1913).

Cemex also disputes that Section 22 was classified as "mineral" land before Whitaker filed his application for purchase and notes that C.M. Whitaker's affidavit does not refer to "land [that] has heretofore been classed as mineral land" as do the affidavits executed by the purchasers of the remaining McKelligon Canyon parcels six and twelve years thereafter. However, the record shows two important handwritten notations on what is apparently the reverse side of Whitaker's

---

[4] "To the public generally, a patent to land having been issued by the state carries with it a high degree of faith and credit as the beginning link in the legal chain upon which all after-acquired title can securely depend." *Bogart v. Moody*, 79 S.W.633, 634 (Tex. Civ. App. 1904), *citing Wimberly v. Pabst*, 55 Tex. 592 (1881).

application. The first appears to the right of the pre-printed word "Class" which is followed by the letter "g," and to the right and slightly above these terms is the handwritten word "Mineral." The second notation states, "File deed of relinquishment to state of all mineral on this land. 10/6/00." The document shows that C.M. Whitaker's application for Section 22 was received on September 24, 1900, and was awarded on November 19, 1900. A letter issued by the GLO Commissioner's office on October 8, 1900, informs Whitaker that the application was being suspended pending his filing of a deed of relinquishment to the State of all mineral on the land. Ten days thereafter, Whitaker filed his affidavit waiving any mineral interests in relation to Section 22. In response to Cemex's complaint, the State supplied a copy of an undated Classification and Appraisal registry which shows that Section 22 was classified as Mineral and Dry Grazing and contains the remarks, "C.M. Whitaker 9/24/00 63672." Additionally, written upon the envelope for the Application and Obligation, the reverse of the Application, and the reverse of the affidavit each is the term, "File 63672," a term which corresponds to the number identified in the remarks of the registry for Section 22. Moreover, that the term "mineral" is on the reverse and not on the face of the application or patent is of no consequence here. Whitaker took the property with the express knowledge that he was purchasing Section 22 without taking title to any of the minerals therein.

Although we are mindful that the evidence does not directly prove that the GLO classified Section 22 as mineral land before the application was filed, the Land Sales Act of 1895 and the Mining Act of 1895, as amended, were each in effect at the time Whitaker applied to purchase Section 22. *See* Act of April 4, 1895, 24th Leg., R.S., ch. 47, § 1, 1895 Tex. Gen. Laws 63; Act of April 30, 1895, 24th Leg., R.S., ch. 127, §§ 1, 10, 14, 1895 Tex. Gen. Laws 197 (repealed 1913). Whitaker's purchase application was deemed effective at the time it was filed with the County Clerk on September 24, 1900. Act of April 4, 1895, 24th Leg., R.S., ch. 47, § 9, 1895 Tex. Gen. Laws 63.

Accordingly, we find that the "mineral" notations on the reverse of the application itself and on the Classification and Appraisal registry for Section 22, along with the State's relatively contemporaneous suspension of Whitaker's application for failure to execute a mineral-waiver affidavit sufficiently demonstrate that Section 22 was classed as mineral land at the time of Whitaker's application, and that both the State and Whitaker understood and intended that no mineral interests should pass to Whitaker as a result of the State's conveyance of Section 22 to him. For these reasons, we find that Section 22 was classified as dry-grazing mineral land and that the State retained title to all minerals within and upon Section 22 when the State sold it to Whitaker.

**1906 - Purchase of Nations 271**

Eli Nations purchased a mineral-classified public-school land parcel under Survey 271 for use as dry grazing land on March 9, 1906. As in the purchase of Section 22 above, Nations was notified that his applications to purchase Survey 271 and other parcels were suspended "because the land having heretofore been classified as mineral land and before we can sell same to you as dry grazing land you will have to file in this office an affidavit and mineral waiver of the mineral rights in favor of the State." Unlike the handwritten affidavit executed by Whitaker for Section 22, Nations executed a pre-printed affidavit wherein he stated that "to the best of his knowledge and belief there are no minerals embraced in Title LXXI of the Revised Civil Statutes of 1895" on the parcel and further swore:

> That said land has heretofore been classed as mineral land, and believing there to be no mineral thereon, and hereby waiving all rights to the minerals on said section to the State of Texas, should there be any mineral deposits of any character hereafter found in or on said land, and in the event of a sale to me of the foregoing land, it is expressly agreed and understood that I acquire no right, title or interest in or to any minerals that are now, or may hereafter be known or found to exist, in or on said land.

*See* Act of April 30, 1895, 24th Leg., R.S., ch. 127, §§ 1, 10, 14, 1895 Tex. Gen. Laws 197 (repealed

1913). On April 12, 1923, Governor Pat M. Neff issued to "J.H. Nations, Assignee," a Letter Patent for the parcel, which stated, "One-sixteenth of the oil and gas and all of other minerals that may be in the above described land are expressly reserved to the Public Free School Fund." The 1990 Warranty Deed for the Nations 271 Survey issued to Jobe Concrete Products, Inc., reserves "1/16th oil, gas and minerals to Public Free School Fund of Texas in Patent Records, recorded in Book 25, Page 575, Real Property Records of El Paso County, Texas," and also contains a "[r]eservation of minerals to the State of Texas, recorded in Book 1605, Page 19, Real Property Records of El Paso County, Texas." We find the Nations 271 parcel was sold by the State to Eli Nations, with Letter Patent issued to his Assignee, J.H. Nations, for use as dry grazing land with the minerals reserved to the State for the benefit of the public free school fund.

**Moor 221 and 222**

On April 9, 1906, Lee Moor executed both the required waiver-of-minerals affidavits and applications to purchase the mineral-bearing public school lands contained in the 640-acre Moor 221 survey and the 448-acre Moor 222 survey, each parcel designated for use as dry grazing land. The record on appeal does not show that patents for these surveyed lands were ever directly issued to Lee Moor. However, six years later, on April 30, 1912, E.D. Strong submitted applications to purchase 560 acres of the Moor 221 survey, as well as the entirety of land contained in the Moor 222 survey "upon the express condition that the minerals therein shall be and are reserved to the [school] fund to which the land belongs." Governor Miriam A. Ferguson issued Letters Patent to E.D. Strong for the entirety of Moor 222 and for all but 80 acres of Moor 221, stating for each parcel that "[o]ne-sixteenth of the oil and gas and all of other minerals that may be in the above described land are expressly reserved to the public free school fund." A 1990 Warranty Deed issued to Jobe Concrete Products, Inc., for "E.D. Strong Survey[s]" 221 and 222 recite this reservation: "One-sixteenth of

all oil and gas and all other minerals reserved to the Public Free School Fund in Patent, dated November 27, 1986, in Patent No. 428, Volume 31A, and in Patent No. 466, Volume 27A, in the General Land Office Records." We find that 560 acres of Moor 221 and the entirety of Moor 222 were each sold by the State to E.D. Strong, a private citizen, as dry grazing land with the minerals reserved to the State for the benefit of the public free school fund.

Importantly, because each of the McKelligon Canyon lands involved a conveyance by the State to a private purchaser, the State did not unequivocally grant to the purchaser anything other than a surface estate. *Schwarz*, 703 S.W.2d at 189, *citing Empire Gas & Fuel. Co.*, 47 S.W.2d at 272. Having concluded that the State reserved title to the minerals belonging to the public school lands conveyed to the purchasers of the Section 22, Nations 271, Moor 221, and Moor 222 parcels, there is no genuine issue of material fact and the State is entitled to summary judgment as a matter of law. *Nixon*, 690 S.W.2d at 548. Because the trial court erred when it denied the State's motion for partial summary judgment, Issue One is sustained.

## II.

We next address whether the trial court erred in granting Cemex's summary-judgment motion, and consider each of Cemex's four grounds in turn. *Patient Advocates*, 136 S.W.3d at 648. In its first summary-judgment ground, Cemex contends that it was entitled to summary judgment because title to "dirt, caliche, sand, gravel, limestone, and other materials at issue [were] not 'minerals' reserved to [the State]" and asserted its ownership of such substances. As we have determined in Issue One, the State reserved title to the minerals set forth in Title LXXI of the Mining Act of 1895 from its conveyance of the McKelligon Canyon lands to Cemex's predecessors in interest. Importantly, because the State did not unequivocally grant to the original purchasers in clear and explicit terms the dirt, caliche, sand, gravel, limestone and other minerals and materials

to which Cemex now claims ownership, those items were withheld from the State's conveyances of the McKelligon Canyon lands and any ambiguity or obscurity in the terms of the statute, such as the terms "the minerals," "stones valuable for ornamental or building purposes," and "other valuable building material," must be interpreted in favor of the State. *Schwarz*, 703 S.W.2d at 189, *citing Empire Gas & Fuel. Co*, 47 S.W.2d at 272. Accordingly, Cemex was not entitled to summary judgment upon this ground.

In its second summary-judgment ground, Cemex asserts that it did not convert anything belonging to the State, that it was granted consent "to do what it has done," and that the State is not entitled to the relief it seeks. Based upon our analysis of both Issue One and Cemex's first ground for summary judgment, we find that a genuine issue of material fact exists regarding the State's conversion claim. TEX. R. CIV. P. 166a; *Nixon*, 690 S.W.2d at 548. Consequently, Cemex was not entitled to summary judgment upon this ground.

Cemex's next summary-judgment ground contends that it did not breach a contract with the State as a matter of law because no contract exists between Cemex and the State and because the "sand, gravel, caliche, and the other materials at issue in this lawsuit that form the basis of [the State's] complaints are not minerals reserved to the State, as a matter of law." Cemex does not dispute that it purchased the McKelligon Canyon lands which were conveyed by the State to the original purchasers, Cemex's predecessors in interest, and because we have found that the State reserved title to the minerals in the McKelligon Canyon lands, Cemex was not entitled to summary judgment upon this ground. *Schwarz*, 703 S.W.2d at 191.

Last, Cemex asserts that partial summary judgment in its favor is proper as to all claims arising before its acquisition of the McKelligon Canyon lands in 2005. Cemex premises its contention upon an affidavit executed by an employee in the GLO's Financial Management Program

who, in response to a discovery request, states in relevant part:

> On August 27, 2009, the GLO received a request for production from Cemex in the State v. Cemex litigation matter. Myself and my staff have been working with the GLO's Legal Division researching, gathering and preparing responsive information for this request.
>
> In paragraph number twenty-two of this request, opposing counsel asks for [A]ll annual reports or similar accounting documents of the General Land Office or Plaintiff relating to leases for dirt, soil, sand, gravel, caliche, clay, granite, limestone and/or any other material or substance from Relinquishment Act Lands in Texas.
>
> Cemex acquired the McKelligon Canyon Lands (MCL), which are the subject of this lawsuit, in 2005. There are four years of GLO Annual Financial Reports from 2005 thru 2008, which have been retrieved and produced. There are twenty-three years worth of GLO Annual Financial Reports from 1981 through 2004 containing approximately four thousand six hundred pages (4,600). There are eleven rolls of microfilm containing GLO Annual Financial Reports for the years of 1947 until 1980. There are approximately 86,000 total images on these reels. The information from the GLO Annual Financial Reports created prior to Cemex's acquisition of the MCL is not relevant to this lawsuit and would create an undue burden on the GLO to produce this information.
>
> It will take months for the GLO to produce the requested information. It will cost the GLO and the citizens of the State of Texas thousands of dollars to comply with this portion of the request.

The State responded that the comment has no relevance to a determination of what the State reserved in its conveyances to the original purchasers in 1900, 1906, and 1912, or to how much Cemex owes the State for its mining of the reserved materials from the McKelligon Canyon lands, and accordingly creates no basis for summary judgment in favor of Cemex on any issue. We agree. The GLO employee's discovery affidavit does not provide a basis for summary judgment because it fails to establish that no genuine issue of material fact exists regarding payments that may be owed by Cemex to the State as the successor in interest to the McKelligon Canyon lands.

Because Cemex is not entitled to summary judgment on any of its four enumerated grounds, the trial court erred in granting summary judgment in its favor. Issue Two is sustained.

**CONCLUSION**

Having sustained Issue One, we reverse the trial court's judgment and render judgment granting summary judgment in favor of the State holding as a matter of law that under Title LXXI of the Mining Act of 1895, title to all deposits of granite, limestone, gravel, sand, and any other mineral substances of whatever kind or character having commercial value located on the McKelligon Canyon lands as herein identified are reserved to the State of Texas. TEX. R. APP. P. 43.2(c); *Patient Advocates*, 136 S.W.3d at 648; *Mid-Century*, 243 S.W.3d at 621, *quoting Argonaut Ins. Co.*, 87 S.W.3d at 529; *Valence Oper. Co.*, 164 S.W.3d at 661. Having sustained Issue Two, we reverse the trial court's erroneous grant of summary judgment in favor of Cemex and remand the case to the trial court for further proceedings. TEX. R. APP. P. 43.2(d); *Mid-Century*, 243 S.W.3d at 621, *quoting Argonaut Ins. Co.*, 87 S.W.3d at 529; *Valence Oper. Co.*, 164 S.W.3d at 661.


GUADALUPE RIVERA, Justice

August 31, 2011

Before Chew, C.J., McClure, and Rivera, JJ.